[No. E054939. Fourth Dist., Div. Two. Nov. 9, 2012.]

In re M.L. et al., Persons Coming Under the Juvenile Court Law.
SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,
Plaintiff and Respondent, v.
A.L., Defendant and Appellant.

## COUNSEL

Law Office of Kimberly R. Burke and Kimberly R. Burke for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Danielle E. Wuchenich, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minors.

OPINION

MILLER, J.—Minors M.L. (born September 2008) and E.L. (born December 2005) (collectively, minors) came to the attention of San Bernardino County Children and Family Services (the department) on April 5, 2011, when the father (father) reported allegations of the mother's (mother) mental incapacity and general neglect of minors. Father reported mother had been diagnosed with schizophrenia and bipolar disorder. He reported mother had been taken off her medication. Mother had been placed on an involuntary psychiatric hold on January 9, 2011, when mother was found walking with minors in 40-degree, wet weather; mother and minors were wearing only pajamas and socks without shoes; minors were wet from the knees down; mother reportedly stated that M.L. was pregnant and purportedly requested scissors to extricate the fetus. Father had retained custody of minors since mother's psychiatric hold, but allowed her supervised visitation after she was released; however, on April 4, 2011, mother refused to return minors to him. Mother reported incidents of domestic violence at the hands of father.

On April 18, 2011, minors were placed in protective custody with the maternal aunt. On April 20, 2011, the department filed a Welfare and Institutions Code[1] section 300 petition with respect to minors with allegations against both mother and father. The juvenile court detained minors on April 21, 2011. On August 16, 2011, the court ordered the release of all mother's previously existing psychiatric records to the department. On September 9, 2011, after permitting admission of evidence of mother's previous psychiatric records during the contested jurisdictional and dispositional hearing, the juvenile court found the allegations against mother true, removed minors from mother's custody, issued a family law order granting custody of minors to father, and dismissed the petition. Mother appeals, contending evidence of her psychiatric records should not have been disclosed to the department and was inadmissible at the hearing. We agree with mother. The judgment is, therefore, reversed and the matter remanded to the juvenile court to hold a new jurisdictional hearing.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

## FACTUAL AND PROCEDURAL HISTORY

At the time of the initial report, mother lived with the maternal grand-mother (maternal grandmother); however, maternal grandmother worked and left minors alone with mother. The social worker met with mother on April 7, 2011. Mother admitted having been placed on involuntary psychiatric holds several times. She admitted leaving her sister's home three months earlier because she feared for minors' lives. Mother admitted she had stopped taking her medication because her doctor was trying to wean her off it. Mother said she was following her mental health treatment plan including taking all of her medication.[2] Mother disclosed father drank heavily, drove intoxicated, and was involved in incidents of domestic violence.

The social worker met with minors away from mother on the same date: "Both children appeared healthy and well cared for. No visible marks or bruises were noted." The social worker met with mother again on April 14, 2011. The social worker met with mother and father separately on April 18, 2011. After the social worker consulted with her supervisor, manager, and other department staff, it was decided to obtain a warrant to take minors into protective custody. The department felt father had sufficient information about mother's mental health issues and plenty of time to have attempted to obtain custody of minors himself.

On April 20, 2011, the department filed a juvenile dependency petition alleging mother suffered from a mental illness that impaired her ability to provide adequate supervision for minors (B-1), had a history of domestic violence that placed minors at risk of physical and emotional abuse (B-2), father had a history of domestic violence that placed minors at risk of physical and emotional abuse (B-3), and had left minors in the custody of mother despite knowing she struggled with mental health issues that impaired her ability to provide adequate supervision for minors (B-4). The court detained minors on April 21, 2011.

The department issued a jurisdiction/disposition report on May 10, 2011, which included details from the social worker's meetings with mother on April 30 and May 4, 2011. Mother denied having any mental health issues prior to 2009. She reported working for the Los Angeles County Sheriff's Department as a jailer, during which she experienced a traumatic event resulting in post-traumatic stress disorder (PTSD). Mother admitted she had been involuntarily hospitalized from February 23 to 27, 2009. She admitted to other hospitalizations, but would not elaborate on the circumstances; she

---

[2] There is nothing in the record that discloses the department considered this statement at all contradictory with mother's previous statement that she had stopped taking her medication.

contended she had been immediately released during the latter hospitalizations because there was no cause to keep her. Mother provided the social worker with a disability claim dated February 23, 2010, which indicated a diagnosis of anxiety disorder.

Mother contended her involuntary hospitalization on January 9, 2011, derived from having bad dreams about minors' safety due to her PTSD. She denied making any statements regarding anyone being pregnant. She admitted that for the 10 months prior to January she was treating herself and not taking her prescribed medications. She reported she was now taking Seroquel daily and had her next doctor's appointment scheduled for May 9, 2011. Mother admitted that after her release from hospitalization in January, father believed she was having supervised visitation, but mother's family was allowing her to have unmonitored contact with minors.

Maternal grandmother reported "that prior to taking medication, the mother was very paranoid and had memory loss." The department requested mother sign a release of information so that it could obtain mother's psychiatric records; mother refused. Father stated he had no knowledge of mother's mental health issues prior to January 2011, though he stated they had been a couple until that month. Father also admitted he knew mother had been hospitalized in May 2010.

Mother gave father a letter in 2010, to be opened only in the event of her death. Father opened it after her hospitalization in January 2011. The letter, dated May 10, 2010, began, "If you are reading this I am dead or incarcerated, by President Obama for fear of impeachment." It continued to exposit a scenario whereby mother had fallen in love with an incarcerated inmate who was an undercover FBI agent, the FBI installed a number of bugging devices and camera equipment in her home with which it was able to watch her every move and send messages through her television and radio, and eventually came to her house and kept her awake for a 48-hour interrogation until it finally released her.

Mother had been treated on an outpatient basis from February 22, 2009, to October 9, 2009, for paranoid ideation, anxiety, hypervigilance, and avoidance. She had been involuntarily hospitalized five times since February 2009. On May 12, 2011, the parties requested mediation; the court set a mediation for June 16, 2011. On June 9, 2011, the department filed a motion requesting the court order Arrowhead Regional Medical Center (ARMC) to release mother's mental health records. The mediation report, dated June 16, 2011, reflected the department agreed to dismiss the B-2 and B-3 allegations. At a hearing on June 20, 2011, mother objected to the department's motion for release of her records based on her doctor-patient privilege. The court denied the department's motion based on mother's assertion of privilege.

On June 21, 2011, the department issued a subpoena duces tecum directed to ARMC to produce all its records pertaining to mother. At a hearing on June 24, 2011, the custodian of records for ARMC appeared with all mother's mental health records under seal. The juvenile court took possession of the records under seal, but offered mother's counsel the "opportunity to file any appropriate motion." The court also afforded mother's counsel the opportunity to go through the records to determine which records she would object to and upon what grounds. On July 14, 2011, mother filed objections to release of her psychiatric records. She contended all the documents were privileged and the juvenile court should not even review the documents in camera itself.

On July 25, 2011, the department filed its response to mother's objections. It requested the court review the documents and determine the validity of any claims of privilege. The department also requested access to the documents to enable it to respond to any claims of privilege.

In an addendum report filed July 26, 2011, the social worker reported she had obtained three law enforcement crisis reports related to mother's mental health issues. In a crisis intervention report by a deputy dated October 28, 2010, the deputy noted he was dispatched to the residence when mother's sister reported mother was acting very strangely, was off her medication, and threatened to hurt minors. Mother said the CIA was watching her and cameras and listening devices had been placed within the house. Mother had reportedly been diagnosed with schizophrenia and anxiety disorder.

In a crisis intervention report dated January 9, 2011, the responding deputy wrote that mother said her uncle was pregnant, she was found walking in 40-degree weather in the rain without shoes or a jacket, and told him the whole world was pregnant. A responding deputy sheriff reported in a crisis intervention report dated February 12, 2011, that mother stated maternal grandmother was inhabited by demons who needed to be taken out, was hallucinating, and "having absurd thoughts not based in reality." She was taken to ARMC.

At a hearing on August 16, 2011, the juvenile court, over mother's objections, ordered release of all her medical records to the department, but ordered that any documents from those records that the department intended to attach to its memoranda be filed separately under seal. In an addendum report filed August 29, 2011, the social worker recommended the B-2 and B-3 allegations be dismissed, the B-1 and B-4 allegations be found true, minors be returned to father, and the juvenile dependency petition be dismissed with family law custody orders. In her addendum report, the social worker recounted numerous facts obtained from the sealed mental health records.

The social worker noted mother had been hospitalized at ARMC on five occasions and diagnosed with a mental condition. Mother had a history of being noncompliant with her medication regime and not obtaining the recommended outpatient care after her releases. Mother was initially hospitalized from February 24 to 27, 2009, after dialing 911 and stating she wished to harm herself. On April 1, 2010, mother was placed on another involuntary hold at ARMC. Maternal grandmother reported to law enforcement that mother attacked her, was acting bizarrely, paranoid, unable to sleep, hyperactive, and said maternal grandmother was an evil spirit. Mother lay down in the middle of the street. Maternal grandmother was concerned about minors. Police brought mother to the hospital believing she was a danger to herself. Mother continued to behave unpredictably while hospitalized and refused to take her medication. An evaluator observed mother was "acutely psychotic, pressured, delusional, and assaultive . . . ."

The social worker reported mother was again hospitalized on October 28, 2010, at ARMC. Mother's sister reported mother was not taking her medication, was acting bizarrely, had a history of violence, and mother's sister feared mother posed a danger to minors. Mother was diagnosed with schizophrenia, paranoid type. On January 9, 2011, mother was hospitalized after having been found in a parking lot in a delusional state, confused, disoriented, and walking in the rain without shoes or clothes.[3] Mother stated the whole world was pregnant.[4] Mother was again diagnosed with schizophrenia, paranoid type. She was hospitalized for nine days. During her hospitalization she apparently threatened to kill herself.

On February 12, 2011, mother was again hospitalized at ARMC when maternal grandmother called 911 to report mother was hallucinating, believed maternal grandmother was a devil, and demons were trying to poison her. Mother was reported to have been in poor medication compliance and gravely disabled. "The mother has continued to deny that she has a mental health issue and denies that at any time, this has placed [the] children in harm's way."

Apparently, since her last release, mother completed a 10-week parenting class and 12 sessions of therapy in family counseling. The social worker spoke with mother's therapist, who stated that mother was extremely guarded, withheld information, and refused to set individual treatment goals. Mother had regular, daily, supervised visitation with minors. Mother enjoyed playing with minors, cooking for them, and putting them to bed. Visitation was

---

[3] The social worker's report conflicts with prior reports that reflect mother had on pajamas.

[4] No mention of minors' presence during this incident is reflected in this social worker's report.

deemed to have gone well and been appropriate. The department noted mother refused to allow the department to obtain a psychiatric evaluation of her.

Attached to the addendum reports were sealed documents containing mother's actual psychiatric records from her involuntary hospitalizations at ARMC. Most of the information contained therein was duplicative of the nonprivileged evidence already admitted into the record or the privileged communications recited in the latest addendum report. The only additional pertinent information contained in the sealed records was the following: while involuntarily hospitalized in February 2009, mother was suffering from postpartum depression and threatening to harm herself; mother refused medication; the physicians obtained permission to involuntarily medicate her pursuant to a petition. During mother's hospitalization in January 2011, she also refused medications and was suicidal.

At the contested jurisdictional hearing on September 8, 2011, the juvenile court dismissed the B-2 and B-3 allegations. Mother refused to take the stand when called by the department; the juvenile court warned her the penalty for refusing to take the stand would be the preclusion of a defense after presentation of the department's case. Mother took the stand, but invoked her federal Fifth Amendment right to remain silent. The court warned her she would thus be precluded from taking the stand in her defense.

The social worker testified mother told her she had written the letter, which was not to be opened until her death. The social worker testified as to the contents of the police reports and confidential psychiatric records. Mother had reported that although she had been hospitalized pursuant to section 5150 on five occasions, they had all been voluntary and mother had been released only four hours later each time.

Mother acknowledged having a mental health condition and being diagnosed with PTSD, but had denied any mental health issues over the past two months. The social worker testified it was father who reported mother had threatened to cut a baby out of her daughter's stomach. Mother reported seeing a counselor, but mother refused to tell the social worker the counselor's name or what medications she was taking. The therapist told the social worker mother had received therapy, but refused to set up treatment goals and limited the scope of what was discussed during sessions.

Minors had daily contact with mother; they were eager to visit with her. Minors were bonded with mother. In the social worker's interviews with the children, nothing caused her concern about their well-being.

Mother called her sister, with whom minors had been placed, to the stand; she testified she had called the police once, in regard to mother's behavior.

Nevertheless, she testified she never reported to anyone that mother posed a risk to minors, had no concern regarding mother's ability to parent minors, and minors asked to see mother every day.

Deputy Howard Scott of the San Bernardino County Sheriff-Coroner Department testified that in January 2011, he observed mother walking down the street in pajamas and socks, with two children all dressed in the same manner; it was a cold (40 degrees), wet day; the children were wet from the knees down. Mother said her uncle and the whole world were pregnant. He opined that it was inappropriate to have minors out in those conditions. He released minors to father and had mother involuntarily hospitalized pursuant to section 5150; he believed mother was a danger to herself and minors.

Prior to the court's findings and orders, mother again objected to disclosure of her confidential psychiatric records. The juvenile court found mother had a serious mental health condition of which she was in denial, she had been uncooperative in seeking to help resolve the issue, and, hence, created a substantial risk to minors both currently and in the future. The juvenile court took jurisdiction over minors; removed them from mother's custody; placed them with father; dismissed the petition; and issued a family law custody order granting mother one 4-hour supervised visit weekly.

## DISCUSSION

*Psychotherapist-patient Privilege*

Mother contends the trial court erred in disclosing her confidential psychotherapist records to the department and, impliedly, in permitting admission of those records into the trial record. The department counters the records were statutorily disclosable pursuant to section 5328, subdivisions (f) and (*l*). Moreover, the department maintains mother waived any privilege by contesting the allegations against her and revealing substantial portions of her treatment. It is apparent the trial court, the parties below, and the parties on appeal have conflated the difference between *disclosure* of privileged records and *admissibility* of such records.

We hold that separate analyses must be made to determine whether privileged records are, on the first hand, disclosable to the opposing party. Once disclosure has been deemed appropriate, the proponent has the additional burden of proving the admissibility of such records into the trial record. Here, we hold the trial court erred in failing to conduct an in camera review of mother's psychotherapist records in order to determine if it was even appropriate or necessary to disclose the records to the department, in whole or in part, especially considering much of the content of those records already

existed in nonprivileged documents contained in other documents in the record. We furthermore find that, even to the extent that disclosure of the entirety of the documents to the department was appropriate, the court erred in permitting the department to include both the records themselves and the content of those records in the department's reports in the trial record without any further evaluation.[5]

"Our Supreme Court has consistently recognized ' "the public interest in supporting effective treatment of mental illness and . . . the consequent public importance of safeguarding the confidential character of psychotherapeutic communication." [Citations.]' [Citation.] At the time the psychotherapist-patient privilege was adopted, it was noted: 'Psychoanalysis and psycho-therapy are dependent upon the fullest revelation of the most intimate and embarrassing details of the patient's life . . . . Unless a patient . . . is assured that such information can and will be held in utmost confidence, he will be reluctant to make the full disclosure upon which diagnosis and treatment . . . depends.' [Citation.]" (*San Diego Trolley, Inc. v. Superior Court* (2001) 87 Cal.App.4th 1083, 1090 [105 Cal.Rptr.2d 476] (*Trolley*).)

■ "Crucial to psychotherapeutic treatment is a patient's readiness to reveal his thoughts, dreams, fantasies, sins and shame. It would be unreason-able to expect a patient to freely participate in such treatment if he knew that what he said and what the therapist learned from what he said could all be revealed in court. A patient in therapy has and needs a justifiable expectation of confidentiality as to his psychotherapeutic treatment. [Citation.]" (*In re Eduardo A., supra,* 209 Cal.App.3d at p. 1042.)

■ "When a parent is afflicted with an illness or disability which may affect the welfare of the child, the confidentiality of communication with a therapist may encourage the parent to seek treatment, and may permit a kind of treatment otherwise impossibl. . . . We must assume the Legislature weighed these considerations in defining the scope of the relevant privileges." (*In re S. W.* (1978) 79 Cal.App.3d 719, 722–723 [145 Cal.Rptr. 143].)

■ The privilege covers not only confidential communication, but any communication made in confidence between the patient and his psychothera-pist. The privilege extends even to communications that have lost their

---

[5] In postjurisdictional proceedings, a juvenile court may order psychiatric evaluations of parents, the substance of which is both disclosable and admissible in subsequent proceedings. (*In re Eduardo A.* (1989) 209 Cal.App.3d 1038, 1041–1042 [261 Cal.Rptr. 68].) However, "At the prejurisdictional stage, an allegation by the Department that a parent is mentally ill or the fact of mental illness alone does not justify a psychological examination of that parent." (*Laurie S. v. Superior Court* (1994) 26 Cal.App.4th 195, 202 [31 Cal.Rptr.2d 506].) However, this barrier should not, in and of itself, permit wholesale discovery and admissibility of a parent's previous psychological records, which have no relation to any dependency proceeding.

confidential nature due to broad disclosure by the patient himself. The patient likewise has the privilege to refuse to disclose or prevent another from disclosing such communications. (*Trolley, supra,* 87 Cal.App.4th at pp. 1090–1091.)

"Of course the psychotherapist-patient privilege may be waived when the patient voluntarily discloses otherwise confidential information or tenders her mental state as an issue. [Citations.] However, '[t]he waiver of an important right must be a voluntary and knowing act done with sufficient awareness of the relevant circumstances and *likely consequences.*' [Citation.]" (*Trolley, supra,* 87 Cal.App.4th at p. 1092.) Even where a patient has waived her privilege, such waiver "must be narrowly construed and limited to matters 'as to which, based upon [the patient's] disclosures, it can reasonably be said [the patient] no longer retains a privacy interest.' [Citation.]" (*Ibid.*)

"Moreover, notwithstanding a waiver, any disclosure of confidential or private information must be supported by a showing of compelling need and accomplished in a manner which protects, insofar as is practical, the patient's privacy. [Citation.]" (*Trolley, supra,* 87 Cal.App.4th at p. 1093.) Thus, even where such evidence is disclosed pursuant to an ostensible waiver, the trial court should exercise its discretion in excluding any such evidence at trial unless its probative value is substantially outweighed by the harm that may be caused by public disclosure. (*Id.* at p. 1093; see *In re Lifschutz* (1970) 2 Cal.3d 415, 438 [85 Cal.Rptr. 829, 467 P.2d 557].)

### 1. *Section 5328 Disclosure*

■ Section 5328 provides that "[a]ll information and records obtained in the course of providing services . . . commencing with Section 5000 . . . to either voluntary or involuntary recipients of services shall be confidential." Thus, all information, records, and services provided pursuant to section 5150 involuntary psychiatric holds are confidential. Nonetheless, section 5328, subdivision (f) provides that such "[i]nformation and records shall be disclosed only . . . [¶] . . . [¶] [t]o the courts, as necessary to the administration of justice." Similarly, section 5328, subdivision (*l*) provides that "[t]he information and records sought to be disclosed shall be relevant to the provision of child welfare services or the investigation, prevention, identification, management, or treatment of child abuse or neglect . . . . [¶] . . . As used in this subdivision, 'child welfare services' means those services that are directed at preventing child abuse or neglect." (§ 5328, subd. (*l*)(1), (2).)

". . . Welfare and Institutions Code section 5328 states a limitation on disclosure, not a ground for admissibility of evidence." (*In re S. W., supra,* 79 Cal.App.3d at p. 722.) Thus, evidence which may be *disclosed* pursuant to

the statute does not automatically make that evidence *admissible* at trial. The proponent seeking admission of the disclosed, privileged evidence at trial has the additional burden of proving that it comes within some statutorily or case-based exception to the psychotherapist-patient privilege. (*Ibid.*)

Here, the department did not request disclosure of the privileged documents pursuant either to section 5328, subdivisions (f) or (*l*). Moreover, the department did not seek disclosure of the privileged documents to the court as provided for in section 5328, subdivision (f). Rather, the department sought disclosure of the privileged documents to itself. Thus, section 5328, subdivision (f) is not at all applicable in the instant case: "[T]he plain language of the exception to confidentiality contained in subdivision (f) of section 5328 says that information and records may be disclosed to the courts, not to an administrative agency through the courts." (*County of Riverside v. Superior Court* (1974) 42 Cal.App.3d 478, 481 [116 Cal.Rptr. 886], italics omitted.) "To construe the limited exception contained in subdivision (f) of section 5328 as permitting disclosure to any person or agency whenever a court determined it was 'necessary to the administration of justice' would tend to nullify the broad legislative provision for confidentiality and would tend to stultify the legislative purpose." (*Ibid.*)

Similarly, section 5328, subdivision (*l*) is inapplicable in the current situation, because the department did not seek disclosure of the documents for the purpose of "investigation, prevention, identification, management, or treatment of child abuse or neglect." Rather, the department sought disclosure of the documents to prove its jurisdictional case. The clear language of the section 5328, subdivision (*l*) exception reflects an intent to disclose such documents for the purpose of aiding the department or other such entities to provide services and treatment to the victim and offender; it does not exist to provide an evidentiary basis with which to permit the department to prove its case, particularly not at the jurisdictional phase.

█ " ' "The petitioner in a dependency proceeding must prove by a preponderance of the evidence that the child who is the subject of a petition comes under the juvenile court's jurisdiction." ' [Citation] 'The basic question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm.' [Citation.]" (*In re A.S.* (2011) 202 Cal.App.4th 237, 244 [134 Cal.Rptr.3d 664].)

Here, the court asked mother's counsel, "how are you going to prove that [mother] doesn't have [a] mental health issue without your client testifying and getting up on the stand, evidentiar[il]y and saying I have no mental health issue or I have a limited health issue." Mother had no duty to prove she did not have a mental health issue. Rather, the department bore the

burden of proving not only that she did have a mental health issue, but that it subjected minors to harm. The juvenile court determined the department had "their hands tied behind their back" unless she released the documents, essentially conceding that without both disclosure and admission of the privileged records the department could not meet its burden of proof.

■ The court further noted that its "job here is to make [the] assessment as to whether or not the children are safe with [mother]. [¶] And, I think that part of my assessment, part of my ability to make that assessment comes because there may be information in those medical records that will assist the court in making that decision." However, there is no statutory or case-based exception warranting disclosure and/or admissibility of confidential psychiatric records simply because the department would otherwise be unable to meet its burden of proof. Were this the only test to be applied in order to disclose and admit such documents at trial, the result would substantially erode the psychotherapist-patient privilege and chill a patient's feeling of freedom in expressing herself during therapy, because any such disclosures could readily be used against her in the future. Indeed, mother's reticence during therapy was used against her as connoting noncompliance with a therapeutic regime; all the while, if she had made any substantive disclosures during her sessions, the department would have been sure to use those against her as well.

Moreover, it appears from the record the court did not even review the records before ordering their disclosure and admissibility. At bare minimum, the juvenile court should have conducted an in camera review of the records with mother's counsel and made an independent determination of whether all or portions of the documents were protected by mother's psychotherapist-patient privilege. (See *People v. Hammon* (1997) 15 Cal.4th 1117, 1119, 1127 [65 Cal.Rptr.2d 1, 938 P.2d 986] [Trial court could quash subpoena for psychotherapist documents without even reviewing the documents in camera even where defendant raised constitutional rights to confrontation and cross-examination of a witness against him.]; *People v. Reber* (1986) 177 Cal.App.3d 523, 532 [223 Cal.Rptr. 139] ["[T]rial court erred to the extent it failed to (1) obtain and examine *in camera* all the materials under subpoena, (2) weigh [claimant's] constitutionally based claim of need against the statutory privilege invoked by [its holder], (3) determine which privileged matters, if any, were essential to the vindication of [claimant's] rights . . . and (4) create a record adequate to review its ruling." (italics added, fn. omitted)], overruled to the extent pretrial in camera review would even be required before quashing a subpoena for privileged matters in *Hammon*; *People v. Boyette* (1988) 201 Cal.App.3d 1527, 1534 [247 Cal.Rptr. 795] [same].) Thus, to the extent the court disclosed and ordered the privileged documents admissible at trial, it erred without first conducting an in camera hearing to determine the issue. Nonetheless, mother's psychiatric records were neither disclosable nor admissible at trial pursuant to section 5328.

## 2. *Waiver*

■ The court below, in ordering disclosure of the documents, made several references to Evidence Code section 996, contending mother had essentially tendered the issue of her psychotherapeutic condition by virtue of her denial of the allegations in the petition. Evidence Code section 1014 provides that a patient "has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and psychotherapist . . . ." The patient is the holder of the privilege. (Evid. Code, § 1013; *Mavroudis v. Superior Court* (1980) 102 Cal.App.3d 594, 602 [162 Cal.Rptr. 724].) "The therapist has no power to waive the patient's privilege and, in fact, is under a duty to assert it. [Citations.]"[6] (*Mavroudis*, at pp. 602–603; see *Trolley, supra*, 87 Cal.App.4th at pp. 1090–1091.) However, the privilege can be waived if the patient, "without coercion, has disclosed a significant part of the communication or has consented to disclosure made by anyone. Consent to disclosure is manifested by any statement or other conduct of the holder of the privilege indicating consent to the disclosure, including failure to claim the privilege in any proceeding in which the holder has the legal standing and opportunity to claim the privilege." (Evid. Code, § 912, subd. (a).) Moreover, where the patient has, herself, tendered the issue of her condition she has waived the privilege. (Evid. Code, § 996, subd. (a).)

■ "By denying the allegations in the petition, the parent does not tender his or her mental state in issue. Only after a finding the child is at risk, and assumption of jurisdiction over the child, do a parent's liberty and privacy interests yield to the demonstrated need of child protection. At that stage, where the aim is to reunify parent and child, expert opinion on the cause and extent of mental illness may be required to ascertain which services will eliminate the conditions leading to dependency." (*Laurie S. v. Superior Court, supra*, 26 Cal.App.4th at pp. 202–203.)

Here, there can be no serious contention that merely by contesting the allegations against her, mother tendered the issue of her psychiatric condition, thus waiving the privilege attached to her confidential psychiatric records. Rather, the department tendered the issue of mother's mental health by filing the petition with the attached allegations; otherwise, the holder of the privilege would be placed in the proverbial "Catch-22" whereby she would have to either admit the allegations against her, and suffer any attached consequences, or deny the allegations, thereby opening up her confidential records to disclosure and admissibility. This is precisely the untenable choice the juvenile court gave mother.

---

[6] We note mother's therapist spoke with the social worker, and revealed details of mother's therapy apparently without mother's permission or the requirement of either a subpoena or court order.

The department cites *In re R.R.* (2010) 187 Cal.App.4th 1264 [114 Cal.Rptr.3d 765], for its contention that mother herself tendered the issue of her psychiatric condition. The juvenile court similarly cited *In re R.R.* when ordering disclosure and admissibility of mother's records. *In re R.R.* is readily distinguishable. In that case, the minors were taken into protective custody when the mother left them in the care of their maternal aunt, but did not return on the promised day. (*Id.* at p. 1268.) The department filed a section 300 petition alleging, as against the father, only the failure to provide the necessities of life to his daughter. (*In re R.R.*, at p. 1269.) The father unilaterally informed the department he was a methamphetamine user years ago, but had been drug free for six years. He volunteered to drug test daily and tested negative. However, the mother later reported she had used drugs with the father only three weeks before the minors were detained. (*Id.* at p. 1270.)

The minors' counsel had a subpoena duces tecum issued to compel production of the father's medical records. (*In re R.R., supra*, 187 Cal.App.4th at pp. 1270–1271.) According to the hospital records, the father had been admitted that year, during which he divulged using methamphetamines, marijuana, cocaine, and consuming five beers daily. (*Id.* at p. 1271.) The department subsequently amended the petition to add allegations against the father that he had admitted to the use of drugs to hospital staff up to a month and a half *after* the minors were detained. (*Id.* at p. 1272.) The father objected to the admission of the hospital records on the ground they were protected by physician-patient privilege. (*Id.* at p. 1278.) The court sustained the petition, finding by a preponderance of the evidence the father's " 'history and fairly recent drug use present a risk to the child because he is indicating now he would like to have a relationship with the child.' " (*Id.* at p. 1275.)

On appeal, the court held the juvenile court properly admitted evidence of the father's records pursuant to the Evidence Code section 996 exception to the physician-patient privilege. (*In re R.R., supra*, 187 Cal.App.4th at p. 1278.) The court noted the exception was justified because when a patient has, himself, placed his medical condition at issue in the case he may no longer justifiably seek protection from its exposure and "in all fairness, a patient ought not to be allowed to establish a condition without a full inquiry into the circumstances. [Citation.]" (*Id.* at p. 1278.) "[N]early from his first appearance, [the] father was intent on showing the social worker and the juvenile court that he was not using drugs and that his drug-free life warranted unmonitored visitation and ultimately custody of [the minor]. In the words of Evidence Code section 996, father tendered his drug use, or more aptly his drug-free life, in the juvenile proceedings and therefore was

not entitled to assert that recent medical records showing substance abuse were privileged." (*Id.* at p. 1279.) "[I]n the present case it was [the] father who put his lack of recent drug use before the court, and he has no privilege to keep hospital records on the subject from being considered by the juvenile court." (*Ibid.*, fn. omitted.)

Here, contrary to *In re R.R.*, mother did not independently come to the department and declare her mental wellness. Rather, the department had already filed a petition alleging she had mental health issues, it came to mother to interview her regarding those allegations, and mother simply answered many of the department's questions. Mother was not reporting items tangential to the substance of the petition in order to curry favor from the department; instead, she was simply responding to the allegations regarding her mental status already made by the department. "By denying the allegations in the petition, the parent does not tender his or her mental state in issue." (*Laurie S. v. Superior Court, supra*, 26 Cal.App.4th at p. 202.) Thus, mother did not tender her mental health status as an issue such that she waived the confidentiality of her privileged psychotherapist-patient records.

The department counters that even if mother did not tender the issue herself, she disclosed such significant portions of her psychotherapy records to the department such that she waived any claim of confidentiality or privilege to them. The department notes mother admitted she had been placed on involuntary psychiatric holds various times, was being weaned off her medications, was properly taking her medications, and had been diagnosed with PTSD.

Nonetheless, as noted above, the privilege extends even to communications that have lost their confidential nature due to broad disclosure by the patient himself. (*Trolley, supra*, 87 Cal.App.4th at pp. 1090–1091.) Moreover, even where a patient has waived her privilege, such waiver "must be narrowly construed and limited to matters 'as to which, based upon [the patient's] disclosures, it can reasonably be said [the patient] no longer retains a privacy interest.' [Citation.]" (*Id.* at p. 1092.) Exceptions to the psychotherapist-patient privilege are narrow and to be liberally construed in favor of the patient. (*In re Eduardo A., supra*, 209 Cal.App.3d at p. 1042.)

 "Under Evidence Code section 912, subdivision (a), a waiver requires disclosure 'of a significant part of the communication' and thus the Supreme Court has 'made it clear that the mere disclosure of the *existence* of the psychotherapist-patient relationship does not reveal a significant part of

the communication and thus does not constitute a waiver.' [Citation.] Even when a patient has revealed the *purpose* of psychiatric treatment, no waiver of the privilege occurs. [Citation.] 'There is a vast difference between disclosure of a general description of the object of . . . psychotherapeutic treatment, and the disclosure of all or a part of the patient's actual communications during psychotherapy.' [Citation.]" (*Trolley, supra,* 87 Cal.App.4th at pp. 1092–1093.)

Here, mother's revealing, after the department had filed a petition and interviewed her, that she had been diagnosed with a mental condition, had received psychiatric treatment for the condition, and was taking medication for that condition, is not such a broad disclosure of her confidential *communications* with her therapists that it warranted both disclosure and admissibility of the entire content of her psychological records. Moreover, we cannot say that mother's disclosure of such information was " 'a voluntary and knowing act done with sufficient awareness of the relevant circumstances and *likely consequences.*' [Citation.]" (*Trolley, supra,* 87 Cal.App.4th at p. 1092.) Likewise, we cannot say that mother's revelations during repeated interviews by the department were not coercive, that she openly consented to such disclosure, or that she neglected to object to disclosure. (Evid. Code, § 912, subd. (a).) At best, mother's revelations would warrant confirmation of the number of times she had been treated, the condition for which she had been treated, and the medication she was on.

This would, again, have required the juvenile court to examine in camera the nonprivileged evidence available in the record, mother's statements, and the contents of the privileged materials in making a specific determination of what privileged information mother had or had not waived. The court would have been required to liberally and narrowly construe the privilege in mother's favor. Moreover, the court would have had to make separate determinations regarding what privileged information should be disclosed and what should be admitted at trial.

Here, we find no compelling reason for disclosure of the portions of mother's psychiatric records that were already abundantly established in other, nonconfidential portions of the record. (*Trolley, supra,* 87 Cal.App.4th at p. 1093 [no compelling need for disclosure]; see *In re Lifschutz, supra,* 2 Cal.3d at p. 438.) Mother's own admission that she was not taking her medication was sufficient evidence to preclude disclosure or admissibility of the same information from her confidential files. The department had the

letter mother had written and given to father. The department had independent confirmation of three crisis interventions during which mother had been involuntarily hospitalized, thus making resort to her privileged documents for such information unnecessary. Those reports also included the details of mother's behavior and statements. The department presented the testimony of the deputy who responded to mother's residence on October 28, 2010, when she was placed on an involuntary psychiatric hold. He testified mother was acting bizarrely and that mother's sister told him she was afraid mother would hurt the children. The department presented the testimony of the deputy who responded to the incident in January 2011, after which mother was again placed on an involuntarily psychiatric hold. He testified mother made strange statements, had minors out in cold weather in inappropriate clothing, and he believed her to be a danger to them. The department also had father's statements regarding the January 2011 incident.

Moreover, we certainly find no compelling reason for the broad disclosure of the entirety of mother's psychiatric records based simply on the few responses she made to questions initiated by the department. Thus, the trial court erred in neglecting to hold an in camera hearing with mother's counsel to determine whether mother had waived the contents of her privileged psychiatric records in whole or in part. The court erred in disclosing and permitting mother's psychiatric records to be admitted into evidence in whole. The very idea that simply because the only admissible evidence the department had regarding the degree of mother's mental health illness was insufficient to sustain jurisdiction itself warranted invasion of her confidential, privileged psychotherapeutic records is anathema to the purpose behind the establishment of the privilege itself.[7]

## DISPOSITION

The judgment of the juvenile court finding jurisdiction and, therefore, its dispositional orders, are reversed. The matter is remanded to the juvenile court to conduct a new jurisdictional hearing in which all evidence obtained from mother's confidential psychiatric records, including that contained in the

---

[7] We make no determination whether such records would be disclosable or admissible at a dispositional hearing occurring after a juvenile court properly found jurisdiction. Of course, the juvenile court would be required to evaluate whether the records were disclosable pursuant to the in camera proceeding described *ante*. Likewise, if disclosed, the department would have the additional burden of establishing admissibility of such records.

department's last report, shall be excluded. At the jurisdictional hearing, the juvenile court shall determine whether mother poses a defined risk of harm to minors at the time of the new hearing.

McKinster, Acting P. J., and Codrington, J., concurred.