PER CURIAM.
Following an investigation conducted by the Calhoun County Department of Human Resources (“DHR”), the Calhoun Juvenile Court (“the juvenile court”) entered a shelter-care order on January 24, 2012, awarding the legal custody of Jo.J. and Ja.J. (“the children”) to DHR, who immediately placed the children in the care of S.J. (“the father”). That same date, the juvenile court entered an order authorizing law-enforcement officials to assist DHR in procuring from the home of the children’s mother, T.J. (“the mother”), certain personal items and furniture used by or belonging to the children. The juvenile court subsequently entered a judgment on April 4, 2012, declaring the children dependent, awarding custody of the children to the father, and ordering DHR to supervise the family pending further orders.[1] The mother appeals from that judgment.
Although the mother attacks the dependency judgment on numerous grounds, we find one issue raised by the mother — whether the evidence is sufficient to sustain a finding of dependency — dis-positive. We agree with the mother that the record does not contain sufficient evidence indicating that the children are dependent.
Section 12-15-102(8)a., Ala.Code 1975, defines a “dependent child” as
“[a] child who has been adjudicated dependent by a juvenile court and is in need of care or supervision and meets any of the following circumstances:
“1. Whose parent, legal guardian, legal custodian, or other custodian subjects the child or any other child in the household to abuse, as defined in subdivision (2) of Section 12-15-301[, Ala.Code 1975,] or neglect as defined in subdivision (4) of Section 12-15-301, or allows the child to be so subjected.
“2. Who is without a parent, legal guardian, or legal custodian willing and able to provide for the care, support, or education of the child.
“3. Whose parent, legal guardian, legal custodian, or other custodian neglects or refuses, when able to do so or when the service is offered without charge, to provide or allow medical, surgical, or other care necessary for the health or well-being of the child.
“4. Whose parent, legal guardian, legal custodian, or other custodian fails, refuses, or neglects to send the child to school in accordance with the terms of the compulsory school attendance laws of this state.
“5. Whose parent, legal guardian, legal custodian, or other custodian has abandoned the child, as defined in subdivision (1) of Section 12-15-301.
“6. Whose parent, legal guardian, legal custodian, or other custodian is unable or unwilling to discharge his or her responsibilities to and for the child.
“7. Who has been placed for care or adoption in violation of the law.
*1172 “8. Who, for any other cause, is in need of the care and protection of the state.”
In the dependency petition, DHR asserted that the children were dependent because it “appears” that the mother has “some serious mental health issues” for which “[s]he is currently not receiving any treatment.” We interpret the petition as alleging that, due to the mother’s existing mental-health problems, the mother was “unable or unwilling to discharge ... her responsibilities to and for the child[ren].” See § 12-15-102(8)a.6., Ala.Code 1975.
The evidence in the record shows that, during an initial investigation regarding a report against the father,[2] Robin McNeal, a ehild-abuse-and-neglect investigator for DHR, developed a suspicion that the mother was suffering from a mental-health problem. When McNeal questioned the mother on that point, the mother informed McNeal that, “at one time,” she had received counseling from “the mental health center” but that she had stopped going because she did not believe she needed it. The mother clarified at the adjudicatory hearing that eight or nine years earlier she had voluntarily sought counseling in Jacksonville at a mental-health center because, she said, “I thought I needed somebody to talk to, and it didn’t work out.” The mother testified that she had never been diagnosed with a mental-health problem or taken any medication for a mental-health problem. McNeal testified that, after meeting with the mother, she concluded that the mother was not receiving any mental-health treatment at the time of the investigation.
DHR initially attempted to present evidence through McNeal’s testimony regarding its basis for questioning the mother’s current mental-health status, but the juvenile court sustained a hearsay objection to that testimony. McNeal then testified as follows:
“Q. (By [counsel for DHR]) What was the concern that you identified, Ms. McNeal, as to requiring the mother to have a mental health assessment? What did you base that on?
“A. Behaviors of the mother to the child and the child’s reaction.
“Q. Did you have an opportunity to observe those behaviors by the mother?
“A. Those behaviors to the child?
“Q. Did you have an opportunity to observe the behavior of the mother?
“A. I have.
“Q. When you observed the behavior of the mother, what concerns did you have?
“A. Denial. She denied that any of that happened, and her explanation for what occurred was not feasible, in that she explained ... the hole in the wall at the bottom of the floor [as] being from her trying to get to the pipes approximately three and a half to four feet up to tighten pipes to prevent a sink from falling that was on the other side of the wall, and this was not feasible. You would have to go in from three and a half feet to — a plumber would have to do that.”
DHR removed the children from the mother’s home based primarily on the mother’s refusal to submit voluntarily to a mental-health assessment. McNeal testified as follows:
“Q. [By counsel for DHR] Was there any other concern! ] while you were investigating this case that you had with the mother that would, in your opinion, put the children at risk?
*1173 “A. Her refusal in sharing mental health information [and] in having an evaluation was concerning.”
According to McNeal, after informing the mother of her “concerns” and after the mother refused to consent to DHR’s request for a mental-health assessment, she “had to assume protective custody of the children.” At that point, DHR instituted shelter-care proceedings and obtained legal custody of the children.
DHR continued to separate the mother and the children based solely on the mother’s refusal to voluntarily cooperate with DHR by providing mental-health records and by submitting to a mental-health assessment. McNeal testified that, following the shelter-care hearing, DHR held an Individualized Service Plan meeting at which it again requested that the mother agree to a DHR-sponsored mental-health assessment, which the mother refused. McNeal testified as follows:
“Q. [By counsel for DHR] Now, in your opinion, as the [child-abuse/neglect] investigator regarding safety of [the children], would [DHR] recommend that those children be placed back without the necessary mental health assessment?
“A. No.
“Q. Why is that?
“A. Due to the — the mother has not cooperated in any way with mental health assessments. [DHR] wants to ensure the children’s safety through those mental health assessments.
[[Image here]]
“Q. Last question. Is the mother’s refusing to participate in any services to alleviate [DHR’s] involvement a remaining concern today?
“A. Yes.”
Fagan Ponder, the DHR foster-care worker who took over the case from McNeal as of January 26, 2012, testified as follows:
“Q. [By counsel for DHR] Let me ask you, Mr. Ponder, from reviewing the case, what would you identify that would be barriers that would need to be remove[d] if the children were placed back with the mom?
“A. First off, just the cooperation with DHR....”
Ponder additionally testified that the mother had sought visitation with the children through her attorney but that, as a condition to “getting visits,” the mother would have had to comply “with services or comply with mental health,” which the mother refused to do. Ponder testified that DHR could not ensure the safety of the children without “the appropriate mental health assessments to address the stability of the mother.”
The mother testified that DHR’s representatives had not requested that she undergo a mental-health assessment but, rather, had told her that, unless she did, she could not see the children. The mother testified that she would not agree to a DHR-sponsored mental-health assessment because, she said, “the way that they have done me, I don’t trust their employees.” The mother stated that she would agree to having a mental-health assessment by a doctor of her own choosing. The mother testified that she had sought an assessment through a mental-health facility in Tulloma, Tennessee, but the facility would not accept her method of payment, i.e., Alabama Medicaid;[3] as a result, the mother had not obtained a mental-health assessment. The mother testified that she *1174 had moved to Tennessee on the Saturday following the shelter-care hearing and that her medical insurance has since been “frozen.” The mother stated that she would obtain a mental-health assessment as soon as her insurance allowed. At the adjudicatory hearing, the mother maintained that she would not agree to a mental-health assessment that was sponsored by DHR and would take place in Calhoun County.
The record establishes that, when it initially removed the children and thereafter prevented any contact between the mother and the children, DHR only suspected that the mother might have a mental-health problem. Regarding the basis for those suspicions, McNeal did not provide the juvenile court with any information she had obtained from other sources as to how a hole in the wall of the mother’s residence had been created. McNeal testified only that the mother had “denied” that some unknown event had occurred, apparently referring to how the hole in the wall had been created. McNeal also testified that she had disbelieved the mother’s explanation for how the hole was created, indicating that she had believed some other unstated version of events to be more plausible.[4] However, DHR did not provide the juvenile court with evidence regarding that alternative version of events or supply the juvenile court with any basis for inferring that the unstated information necessarily indicated that the mother had created the hole while in the throes of some bizarre, erratic, or impulsive behavior due to a mental-health problem. Without such evidence, any conclusions the juvenile court may have reached as to what had happened and how those events pointed to the mother’s having a mental-health problem could be based only on speculation and conjecture. See In re Jertrude O., 56 Md.App. 83, 466 A.2d 885 (1983) (holding that juvenile court cannot remove child from home and continue shelter care based upon speculative possibility that child had been or would be abused or harmed by parent).
In the adjudicatory hearing, DHR did not present any psychological or psychiatric evidence to confirm its suspicions that the mother suffered from a mental-health problem. Rather than avail itself of the legal process to secure a mental-health assessment, see Rule 1A, Ala. R. Juv. P., and Rule 35, Ala. R. Civ. P.; see also § 12 — 15—130(c), Ala.Code 1975, or to compel production of any of the mother’s mental-health records, see Rule 1A, Ala. R. Juv. P., and Rule 34, Ala. R. Civ. P.,[5] DHR elected to present no evidence in the form of expert opinions or otherwise to substantiate its claim that the mother was suffering from a mental-health condition. Instead, DHR proceeded to the adjudicatory hearing upon the theory that it could withhold custody, and even visitation, from the mother until she submitted to a mental-health assessment or presented mental-health records that allayed its “concerns” that she had a mental-health problem.
The law, however, does not place the burden on a parent to prove his or her mental-health fitness to the State in order to sustain his or her custody rights. See In re M.L., 210 Cal.App.4th 1457, 1470, 148 Cal.Rptr.3d 911, 922 (2012) (“Mother had no duty to prove she did not have a mental health issue.”). DHR has not cited to this court a single case that states that a *1175 parent has an obligation to respond to its extrajudicial requests or demands for mental-health information, much less any authority stating that a juvenile court can make an adverse inference against the parent for refusing to cooperate with those requests or demands. Generally speaking, parents have a fundamental right to the custody of their natural children. See Ex parte E.R.G., 73 So.3d 634, 639 (Ala.2011). Accordingly, the law presumes that a custodial parent is fit in every respect to care for his or her children. See Griggs v. Barnes, 262 Ala. 357, 78 So.2d 910 (1955). In order for the State to intrude into the solicitude of a family and to alter the custodial rights of a parent, the State bears the burden of proving by clear and convincing evidence that the parent is unfit to care for the child. Ex parte E.R.G., supra. Until it discharged that burden, DHR had no lawful basis for requiring the mother to comply with any of its conditions in order to regain her custody rights.
Our review of the record reveals that, at best, DHR proved only that its workers had formed a suspicion that the mother may have a mental-health problem. It is not enough that the evidence raises only a question as to the dependency of a child. T.H. v. Jefferson Cnty. Dep’t of Human Res., 70 So.3d 1236, 1247 (Ala.Civ.App.2010) (Per Moore, J., with two judges concurring in the result). “The fear of harm to the child ... must be a real one predicated upon hard evidence; it may not be simply gut reaction or even a decision to err-if-at-all on the side of caution.” In re Jertrude O., 56 Md.App. at 100, 466 A.2d at 894. Unless DHR presents “clear and convincing evidence,” the dependency petition must be dismissed. § 12 — 15—310(b), Ala. Code 1975. “Clear and convincing evidence” is “ ‘[ejvidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.’ ” L.H. v. Lee Cnty. Dep’t of Human Res., 40 So.3d 747, 749 (Ala.Civ.App.2009) (quoting M.E. v. Shelby Cnty. Dep’t of Human Res., 972 So.2d 89, 92-93 (Ala.Civ.App.2007)). This court can affirm a finding that a parent has a mental-health problem that prevents that parent from rendering proper care and supervision to a child only if the juvenile court reasonably could have been clearly convinced of that fact from the evidence contained in the record. See Ex parte McInish, 47 So.3d 767, 778 (Ala.2008) (explaining appellate standard of review of judgments containing findings of fact required to be proven by clear and convincing evidence).
In a very similar situation, when DHR failed to present admissible expert testimony or other evidence of a mental disability, this court reversed a judgment terminating a parent’s parental rights because the evidence was insufficient to prove the mental disability of the parent whose child suffered from cerebral palsy. See C.S.B. v. Alabama Dep’t of Human Res., 26 So.3d 426 (Ala.Civ.App.2009). In that case, a majority of this court recognized that a juvenile court could recognize an obvious mental disability from the incoherent responses of the mother during direct and cross-examination but that the juvenile court could not extrapolate from that bare inference that the mother lacked the mental acuity to properly care for her child such that her parental rights should be terminated. More recently, in Washington v. State, 95 So.3d 26 (Ala.Crim.App.2012), the Court of Criminal Appeals held that a trial court could use its own observations to resolve a conflict among experts regarding the mental competency of a defendant to stand trial for capital murder, but the court did not hold that the trial court could decide the competency of the *1176 defendant based solely on its own observations.
In this case, the record does not contain conflicting evidence as to the mental health of the mother. She categorically denied any existing mental-health problem, and DHR presented no evidence indicating that she suffered from such a condition. The mother also gave perfectly rational responses to the questions from the attorneys and the juvenile court. The juvenile court may not have believed some of those responses, but it could not lawfully have determined from its mere observations of the mother that she had a mental-health problem that prevented her from properly caring for the children, or that threatened the children with harm, without the benefit of actual evidence to that effect.
The record is devoid of any evidence indicating that the mother had ever actually harmed or even threatened to harm the children, who were ages 12 and 15 at the time of the adjudicatory hearing. The record also does not include clear evidence that would lead a reasonable fact-finder to be convinced that the mother suffers from a mental-health problem that could endanger the safety of the children. Because the evidence in the record is insufficient to support the juvenile court’s finding of dependency,[6] we reverse the juvenile court’s judgment and remand the case for the juvenile court to enter a judgment dismissing the dependency petition. See § 12-15-310(b), Ala.Code 1975.
The mother also argues that the juvenile court lacked the authority to enter an order allowing DHR to remove personal property from her home. In its shelter-care order, the juvenile court ordered a list of 22 items, including bedroom furniture and accessories, games, toys, clothing, and medications to be removed from the home of the mother. That list also included the family dog, a glass-top table, and an exercise machine. The juvenile court subsequently ordered DHR and the Calhoun County sheriff to obtain the dog and issued a writ of assistance directed to the sheriffs office to obtain the other items. On April 5, 2012, the juvenile court found the mother in contempt and issued a writ for her arrest based on her noncompliance with the foregoing orders.
Because they are not constitutional courts, juvenile courts only have power as is conferred upon them by statute. Ex parte K.L.P., 868 So.2d 454, 456 (Ala.Civ.App.2003). The mother argues that no statute expressly authorizes a juvenile court to order the removal of items from the home of a parent. The mother further points out that the Alabama Constitution *1177 of 1901 prohibits the State from taking private property without the owner’s consent, see Ala. Const, of 1901, art. I, § 23, and that § 18-1B-1, Ala.Code 1975, prevents State agencies invested with the power of eminent domain from taking private property for the private use of another. Therefore, the mother contends, the juvenile court did not have jurisdiction to enter any of the orders relating to the removal of the personal property from the mother’s home.
DHR responds that §§ 12 — 15—B14(a)(3)c. and 12 — 15—314(a)(4), Ala.Code 1975, give juvenile courts broad authority to enter any orders “as the juvenile court in its discretion shall deem to be for the welfare and best interests of the child.” However, those subsections relate solely to the disposition of the custody of “dependent children.” At the time the orders were entered, the children had not been declared to be dependent, and, as held above, the subsequent finding of dependency was erroneous. Subsections (a)(3)e. and (a)(4) of § 12-15-314 did not authorize the juvenile court to order the removal of the personal property from the home of the mother.
In In re K.P.R., 197 Ohio App.3d 193, 195, 966 N.E.2d 952, 953 (2011), a child was visiting with his noncustodial father when his mother unexpectedly died. The child thereafter remained in his father’s home. Id. The father, based on an order of the juvenile court of Warren County, Ohio, subsequently obtained some of the child’s belongings and furniture from the mother’s home. The child’s stepfather subsequently moved the court to order the father to return the items, and the court ordered the father to return some of the items. Id. On appeal, the father argued, among other things, that the juvenile court lacked any jurisdiction over the property dispute and, therefore, that it did not have the authority to permit the father to take the items in the first place or the authority to later require him to return those items. 197 Ohio App.3d at 199-200, 966 N.E.2d at 957. In vacating the order requiring the father to return the items, the Ohio Court of Appeals for the Twelfth District stated: “[W]e cannot locate any authority giving the juvenile court jurisdiction to order the disposition of property from the mother and stepfather’s home.” 197 Ohio App.3d at 200, 966 N.E.2d at 958.
No language in the Alabama Juvenile Justice Act (“the AJJA”), § 12-15-101 et seq., Ala.Code 1975, can be read broadly to imply that juvenile courts have jurisdiction over personal property owned by a parent, especially in light of the general constitutional and statutory prohibitions against a government’s taking of private property. Likewise, we cannot locate any authority in the AJJA that grants to juvenile courts the power to decide issues relating to the disposition of personal property, even if that personal property may be considered that of the children at issue and even if the disposition would serve the children’s best interests. Thus, we hold that juvenile courts do not have the authority to order the removal of personal property from the home of a parent.
We therefore conclude that the juvenile court lacked jurisdiction to enter the orders allowing the removal of the items of personal property from the home of the mother. An order entered without jurisdiction is void. See B.L.R. v. N.M.N., 69 So.3d 868, 870 (Ala.Civ.App.2011). “ ‘This court is required to dismiss an appeal from a void judgment.’” R.T. v. B.N.H., 66 So.3d 807, 812 (Ala.Civ.App.2011) (quoting Owens v. Owens, 51 So.3d 364, 367 (Ala.Civ.App.2010)). Thus, we dismiss the mother’s appeal as it relates to the orders entered by the juvenile court regarding the mother’s personal property, albeit with instructions to the juvenile *1178 court to vacate those void orders, R.T., 66 So.3d at 812, including the judgment finding the mother in contempt for violating those void orders. See Old Dominion Tel. Co. v. Powers, 140 Ala. 220, 227, 37 So. 195, 197 (1904) (holding that a defendant cannot be punished by contempt proceedings for disregarding a void order).
APPEAL DISMISSED IN PART; REVERSED AND REMANDED WITH INSTRUCTIONS.
BRYAN and MOORE, JJ., concur.
PITTMAN, J., concurs in the result, without writing.
THOMPSON, P.J., dissents, with writing, which THOMAS, J., joins.

. Because that judgment failed to address the mother’s request for visitation, this court remanded the case to the juvenile court to address that request, which it did, making the judgment final so as to support this appeal.

. DHR received a report that the father was giving the children access to marijuana and alcohol, which report DHR concluded was unfounded.

. The mother refused to sign an authorization to allow DHR to obtain any records from that visit, but the mother testified that she did not receive any form of evaluation or treatment at that time.

. Later in her testimony, McNeal stated that she had learned of the hole in the wall from "the child," but she did not identify which child or what information the child had provided her regarding the hole.

. We make no comment as to whether DHR would have been entitled to such discovery because that issue is not before us.

. DHR did not include in its petition any other basis for asserting the dependency of the children. At trial, DHR did not attempt to present evidence relating to any other basis. In response to a single question, a DHR witness testified that he had no information regarding the mother’s current residence, and the mother testified at one point that she did not have any income at the time of the hearing; however, DHR did not try to prove or argue that the children were dependent based on the mother’s current housing situation or lack of income. Although we have held that this court can affirm a finding of dependency on legal grounds other than those stated in the petition, see T.H. v. Jefferson Cnty. Dep’t of Human Res., 70 So.3d at 1245, we may do so only consistent with the due-process rights of the parent. See Liberty Nat’l Life Ins. Co. v. University of Alabama Health Servs. Found., P.C., 881 So.2d 1013, 1020 (Ala.2003) (noting that judgment cannot be affirmed on a ground of which litigant had no notice). The mother had no notice that DHR was asserting the dependency of the children for any reason other than her alleged mental unfitness, and the parties did not litigate the issues whether her poverty or current residential conditions rendered her incapable of properly caring for the children. Under these circumstances, this court cannot affirm the judgment based on those grounds.