MOORE, Judge.
T.N.S.R. (“the mother”) appeals from a judgment of the Calhoun Juvenile Court (“the juvenile court”) transferring custody of T.L.W. (“the child”) from her to N.P.W. (“the father”). We reverse the judgment.

Background

The child was born out of wedlock on December 30, 2008, with the father being identified on the birth certificate of the child as the father of the child. The parties originally raised the child jointly, except for a brief six-week period. However, when the child was approximately one year old, the father, following problems in his relationship with the mother, decided to better his life by moving by himself to South Carolina, leaving the child in the care of the mother and the child’s paternal grandmother. Thereafter, the father paid the mother weekly child support and visited with the child every other weekend in Oxford. The parties maintained that arrangement for the next three years, with the mother eventually moving into her own mobile home at some point. The father testified that the arrangement had served the best interests of' the child and had improved his relationship and the quality of the time he spent with the child.
The mother testified that, on December 30, 2010, she informed the father that their romantic relationship had ended. After-wards, the mother began a relationship with another man; that relationship produced a daughter, the child’s half sister, in October 2011. The father testified that, following the birth of- the child’s half sister, it became “increasingly difficult” for him to maintain contact with the child, until he completely lost communication with the mother and the child in June or July 2012 when they moved to Colorado with the mother’s now husband, the father of the child’s half sister. The mother testified that she had informed the father in advance of her move to Colorado, that, after the move, the father quit paying child support, and that she had facilitated telephone contact between the father and the child while she was living in Colorado.
On September 19, 2012, the father filed a paternity and custody action. The mother ' denied the father’s paternity and demanded genetic testing; she also petitioned for sole custody of the child. After the testing revealed, in March 2013, that the probability of the father’s paternity was 99.99998%, the mother filed a counterclaim to terminate the father’s parental rights. The mother testified, however, that she had decided not to pursue the termination counterclaim, which was voluntarily dismissed during the trial, and that she had agreed that the child should resume his relationship with the father through visitation. The juvenile court approved a visitation schedule that had been *686 agreed upon by the parties on May 23, 2013, when it adjudicated the paternity of the child in favor of the father. By that time, the mother was living in Virginia, where her husband, a military employee, had been transferred, and she was pregnant with her-third child, who was subsequently born in August 2013. The visitation between the father and the child went well, although the child would demonstrate hostility toward the father at the beginning of the visitations.
At trial, the father testified to former drug use and criminal activity, but the mother agreed that the father had matured and that those problems were in his past. The father testified that he had been a good father to the child, which the mother also confirmed, testifying that she believed the child should maintain a close relationship with the father. The mother testified that the father had been physically abusive toward her during their relationship, which the father denied, and that, at one time, he had been diagnosed with bipolar disorder and depression. Undisputed evidence also showed that the father had another child, who lived in Washington state, with whom he had no relationship. Nevertheless, the mother testified that she did not know of any reason to question the parenting ability of the father at the time of the trial. The father’s pastor testified that the father had overcome his past problems and that he was a good parent to the child. The father presented no evidence as to the parenting of the child by the mother. The juvenile court attempted to question the child, but he did not respond to most of the questions, despite the encouragement of both parents.
On February 17, 2014, the juvenile court entered a judgment that, among other things, awarded the father sole physical custody of the child. In its judgment, the juvenile court set out detailed findings of fact in which it determined that the mother had taken actions “both before and during this proceeding to reduce and or eliminate the [fatherj’s involvement with the minor child” and that the mother had “alienated the affections of the child for his father.” The mother filed a postjudgment motion on March 3, 2014; that, motion was denied by operation of law on March 17, 2014. See Rule 1(B), Ala. R. Juv. P. The juvenile court stayed enforcement of its judgment, after which the mother timely appealed.

Issue

On appeal, the mother argues that the juvenile court erred in determining that it was in the best interests of the child to be removed from her custody and from the home he shared with his half siblings on the basis of parental alienation, which, she says, was not proven by sufficient evidence at trial.

Standard of Review

‘“A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong. Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994) (quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App.1993)) (citations omitted). However, the presumption of correctness does not apply to a trial court’s conclusion of law, including the application of the law to the undisputed facts. See Greene v. Greene, 249 Ala. 155, 157-58, 30 So.2d 444, 446 (1947).

Analysis

In this case, the father voluntarily acquiesced to an arrangement whereby the mother served as the sole physical custodian of the child for several years because the father believed that arrangement to be in the best interests of the child.
*687 “ ‘Where a parent has transferred to another the custody of his infant child by fair agreement, which has been acted upon by such other person to the manifest interest and welfare of the child, the parent will not be permitted to reclaim the custody of the child, unless he can show that a change of the custody will materially promote his child’s welfare.’ ”
Greene, 249 Ala. at 157, 30 So.2d at 445 (quoting Stringfellow v. Somerville, 95 Va. 701, 707, 29 S.E. 685, 687 (1898)). The juvenile court did not apply that rule of law, which has since morphed into the McLendon standard, see Ex parte McLendon, 455 So.2d 863 (Ala.1984), because the parties tried the case under the theory that the juvenile court was making an initial custody determination based on the best interests of the child. See Ex parte Couch, 521 So.2d 987 (Ala.1988). However, even using the best-interests-of-the-child standard, the juvenile court was required to consider “the effect on the child of disrupting or continuing an existing custodial status.” Ex parte Devine, 398 So.2d 686, 697 (Ala.1981).
In this case, the mother acted as the primary caretaker of the child for years, a weighty consideration. See Kaiser v. Kaiser, 868 So.2d 1095, 1101 (Ala.Civ.App.2003) (“We agree that who the primary caregiver of a child has been is an important factor. Indeed, it may even be dis-positive in an appropriate case.”). During that time, the child apparently received appropriate daily care from the mother, and the father failed to present any evidence rebutting the presumption of her fitness. See T.J. v. Calhoun Cnty. Dep’t of Human Res., 116 So.3d 1168, 1175 (Ala.Civ.App.2013) (“[T]he law presumes that a custodial parent is fit in every respect to care for his or her children.”). A trial court should tread lightly when considering severing “ties of affection resulting from years of association between the child and its custodian,” Dale v. Dale, 54 Ala. App. 505, 507, 310 So.2d 225, 227 (Civ.App.1975), and, ordinarily, a trial court should not disturb the “stability in a child’s environment and the child’s relationships with those who have cared for and loved [him or her].” R.K. v. R.J., 843 So.2d 774, 777 n. 2 (Ala.Civ.App.2002).
Furthermore, “[w]hen resolving a custody dispute, particularly in these days of blended families, a trial court should not perfunctorily separate half siblings without giving sufficient consideration to the best interests of the children at issue.” A.B. v. J.B., 40 So.3d 723, 730 (Ala.Civ.App.2009). In its judgment, the juvenile court specifically found that it was in the best interests of the child to encourage and strengthen his relationship with his younger half siblings, who the mother testified that the child “adores” and loves. That interest would obviously be better served by leaving the child in the custody of the mother, with whom the half siblings live.
The juvenile court decided to remove the child from the custody of the mother, with whom he had resided his entire life, and from the home he shared with his half siblings, and to place the child in the sole custody of the father, with whom he had never resided without the mother, exclusively on the ground that the child had been subjected to “alienation of affections.” Presumably, the juvenile court was referring to “parental alienation,” “[a] situation in which one parent has manipulated a child to fear or hate the other parent;. a condition resulting from a parent’s actions that are designed to poison a child’s relationship with the other parent.” Black’s Law Dictionary 1288 (10th ed.2014) (defining “parental-alienation syndrome). However, the evidence in the record does not sustain a finding of parental alienation.
*688 Following a pretrial conference in May-2013, seven months before receiving any evidence in the case, the juvenile court made the following observations:
“[Juvenile court]: Based on my review of the pleadings and the information that the lawyers gave me, it appears that the mother of this child has attempted to prevent the father from having any relationship with the child without valid cause. I will keep my mind open, I will have a hearing, and that may not be so, but it looks that way to me.
“Furthermore, the mother has filed a petition to terminate parental rights. She has demanded, a DNA test when in fact I take judicial notice that the birth certificate clearly states that [the father] is the father of the child.
“It appears to me that she has used legal process to prevent the father from having contact with the child.”
As stated above, the child was born out of wedlock. Although the father was listed on the child’s birth certificate, at least circumstantially indicating that the parties had jointly and formally acknowledged his paternity pursuant to Ala.Code 1975, § 26-17 — 215(c), see In re Reyes, 369 Ill.App.3d 150, 860 N.E.2d 456, 307 Ill.Dec. 802 (2006), the father elected to file a paternity action to conclusively establish his legal status as the father of the child. During the trial, the father testified that it had been questionable whether he was the biological father of the child because the mother had been sexually active with other men around the time of conception. Given those circumstances, it was understandable that the mother disputed the father’s paternity. By seeking genetic testing to confirm the biological relationship between the child and the father, the mother was only acting within her legal rights. See generally Cauthen v. Yates, 716 So.2d 1256 (Ala.Civ.App.1998).
The mother filed a counterclaim to terminate the parental rights of the father in April 2013, before the juvenile court adjudicated the paternity of the child, but she did not prosecute that counterclaim, testifying at trial that she had instructed her attorney to voluntarily dismiss the counterclaim after deciding that the child should have a relationship with the father. After receiving the genetic-testing results in March 2013, the mother actually agreed, in May 2013, to a visitation schedule to allow the father and the child to become acquainted with one another again, and, except when medical problems resulting from her third pregnancy prevented her from traveling, she complied with her duties under that agreement to deliver the child to a halfway point between her home in Virginia and the father’s home in South Carolina, which halfway point was four hours from her home. Nothing in the pleadings or the motions before the juvenile court should have raised any inference that the mother was abusing the legal process to prevent the father from contacting the child, as the judge stated.
The evidence adduced at the trial of this case does indicate that the mother had taken some actions that separated the father from the child. However, despite the mother’s decision to start a new family and to relocate with the child in June or July 2012, the record in this case contains no evidence indicating that the mother had encouraged the child to fear or to hate the father or that she had committed any actions to poison the child’s relationship with the father. The father testified that, when the child first goes with him for his visitations, the child is sometimes “kind of hostile,” that “[i]t takes a couple of days to get him on an even keel, and [that,] after that, [the child] responds to [the father] very *689 well.” However, the father never offered any evidence indicating that the child, who was only four years old at the time his visits with the father resumed, had been manipulated by the mother to dislike or distrust the father. Indeed, the father never intimated that the mother would have ever engaged in such misconduct.
During the trial, the juvenile court attempted to question the child, first outside the presence of the parents and then with both parents in attendance. The child answered only a few general questions but stated that he did not want to answer any other questions, despite the encouragement of both parents. In its judgment, the juvenile-court judge summarized her attempt to question the child as follows:
“12. That this Court has interviewed young children for almost thirty years as an attorney handling family law and other matters and for five years as a judge.
“13. That this Court cannot ever remember having been completely unable to talk to a child about any subject, but the parties’ minor child absolutely refused to talk about any subject whatsoever, refused to leave [the mother’s] side and would not stay in the Courtroom without his mother.
“14. That based on the Court’s training and experience in family court matters, the demeanor of the [mother] at trial, the [mother]’s actions to reduce and/or eliminate the [father’s involvement in his son’s life, and the demeanor and behavior of the child in the Courtroom, the Court finds that the [mother] has alienated the affections of the child for his father.”
No reasonable inference can be drawn from the reticence or outright refusal of a five-year-old child to respond to questions from a judge, who was a complete stranger to that child, much less an inference that one parent has caused the child to be alienated from the other parent. >

Conclusion

The juvenile court’s finding that the mother had alienated the child from the father, which was the exclusive basis for its determination that it would be in the best interests of the child to be in the custody of the father, is plainly and palpably wrong. Applying the law to the undisputed facts, removing any unsupported inference of parental alienation, the judgment is due to be reversed and the custody of the child awarded to the mother. See Greene, 249 Ala. at 157-58, 30 So.2d at 446 (“ “We are fully mindful of the due weight to be accorded the conclusions of the trial judge before whom the parties and witnesses appeared and testified. Yet it seems clear that he has erred, not so much in conclusions of facts, as in the application of the governing principles of law, and in such a case our responsibility is to adjudicate the cause in this light.’ ” (quoting Fort v. Fort, 246 Ala. 83, 86, 18 So.2d 870, 872 (1944))). On remand, the juvenile court can protect the relationship between the father and the child through a visitation award and any other lawful means without sacrificing the beneficial custodial arrangement under which the child has long lived.
REVERSED AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., arid THOMAS and DONALDSON, JJ., concur.
PITTMAN, J., dissents, with writing.