MOORE, Judge.
F.C. ("the mother") appeals from a judgment of the Madison Juvenile Court ("the juvenile court") that, among other things, awarded S.J.M. custody of the child born to the parties and ordered the mother to pay child support. We affirm the juvenile court's judgment.
Procedural History
On March 16, 2016, S.J.M. filed in the juvenile court a verified petition for custody, alleging, among other things, that a child had been born to the parties on November 14, 2008, that S.J.M. had completed a "Voluntary Acknowledgment of Paternity" at the child's birth, that the parties were never married, and that the child was in the mother's custody. S.J.M. sought "a finding that [he] is the legal and biological father of the minor child," an award of sole physical custody and joint legal custody of the child, and an award of child support from the mother. On April 7, 2016, the mother filed a motion to dismiss S.J.M.'s petition for lack of jurisdiction. She alleged, among other things, that paternity *592 of the child was not at issue, that no previous custody order regarding the child had been entered, that there was no allegation of dependency in S.J.M.'s petition, and that the case was merely a child-custody proceeding. S.J.M. filed a response to the mother's motion on April 19, 2016. On May 9, 2016, S.J.M. filed an amended petition, adding "a request for a judicial determination of paternity." On May 26, 2016, S.J.M. filed a motion for a pendente lite order awarding him sole physical and legal custody of the child.
The mother filed an answer to S.J.M.'s original petition on June 3, 2016. She filed an answer to S.J.M.'s amended petition on that same date; the mother asserted in that answer that she had no objection to a judicial determination of paternity. The mother also filed a counterclaim requesting, among other things, sole physical and legal custody of the child, an award of child support, and an award of retroactive child support in favor of the mother and against S.J.M. The mother filed a motion seeking pendente lite relief on June 3, 2016, as well. The juvenile court conducted a pendente lite hearing on June 8, 2016, and, on June 17, 2016, the juvenile court entered a pendente lite order that ordered the parties to exercise joint custody of the child pending a final hearing and directed how the custody exchanges should occur. On October 11, 2016, S.J.M. filed an answer to the mother's counterclaim.
The trial was conducted on October 24, 2016. On October 26, 2016, the juvenile court entered a final judgment adjudicating S.J.M. as the legal father of the child, pursuant to the Alabama Uniform Parentage Act ("the AUPA"), Ala. Code 1975, § 26-17-101 et seq. ; awarding the parties joint legal custody of the child; awarding S.J.M. sole physical custody of the child, subject to the mother's visitation rights; ordering the mother to pay to S.J.M. $237 per month in child support; and denying all remaining requested relief. The mother filed a postjudgment motion on November 9, 2016. On November 17, 2016, the juvenile court entered an order on the mother's postjudgment motion; the juvenile court made additional findings, but it otherwise denied the relief sought in the mother's motion. The mother filed her notice of appeal to this court on November 30, 2016.
Facts
S.J.M. (hereinafter referred to as "the father") testified that he and the mother first became involved in a relationship in 2007, while he was living in Virginia and the mother was living in Maryland. He testified that the child was born on November 14, 2008; that, in 2010, the parties had relocated to Madison, Alabama, with the child; and that the parties had ended their relationship in 2011. S.M., the child's paternal grandmother, testified that the father and the mother had lived with her in Virginia when the mother was pregnant with the child and that the mother and the child had continued to live with her when she moved to Madison in 2010 until the mother and the child moved to Huntsville in 2011. The paternal grandmother also testified that the mother and the child had stayed with her at times since they had moved to Huntsville. According to the father, after the parties separated in 2011, he moved from Madison to Virginia, and then he moved to Enterprise, Alabama. The father testified that he lived in Enterprise until he moved back to Madison in February 2016. He stated that, when he lived in Enterprise, he had visited the child on his days off, on holidays, on birthdays, on other vacation days, and at other times. The father testified that he had seen the child at least once or twice a month during that time. He admitted that he had never paid any child support to the mother.
*593 According to the father, at the time of the trial, he was living in a four-bedroom house in Madison that belongs to the paternal grandmother. He testified that the paternal grandmother occupies 1 bedroom; that he and his current wife, M.M., share a bedroom; that his 2 stepsons, ages 7 and 11, share a bedroom; and that his two daughters by his current wife, ages 2 and 4, share a bedroom with the child when she is in his custody, and that their shared bedroom has bunk beds. He testified that he works for a defense commissary and that he had worked for that employer for almost seven years. The father testified that the child was attending a private school operated by St. Johns Baptist Catholic Church at the time of the trial and that she had been enrolled in that school from pre-kindergarten through the second grade. He stated that he pays the child's school tuition and that the child has many friends at her school. According to the father, the child was doing better in school at the time of the trial than she had in the previous year, although, he said, she continued to have difficulties with reading and spelling.
The father testified that the child and her stepbrother, who are the same age but in different schools, help each other with their schoolwork and that that had helped the child improve in school. M.M. testified that their household is very family oriented and that they have a steady routine and maintain a schedule for the children. M.M. testified that she and the father transport the child to and from school. M.M. and the paternal grandmother reiterated the father's testimony that M.M.'s son, the child's stepbrother, helps the child with her homework and with understanding their schoolwork. M.M. stated that she and the father try to keep the children busy with extracurricular activities to make sure that they are disciplined and as an incentive to maintain their grades. The father testified that he had enrolled the child in a gymnastic class over the summer, although, he said, she had recently stopped attending that class. He stated that the mother did not take the child to the gymnastic class during her custodial periods. The father stated that the child had been having issues with her sight, that she had been prescribed a pair of glasses two weeks before the trial, and that the child had been more active and in high spirits since she had received the glasses. According to the father, the child interacts well with her half sisters and stepbrothers and is very close to the paternal grandmother. He stated that he loves the child with all his heart, and M.M. testified that she loves the child like she is her own.
The paternal grandmother testified that the father, the father's brother, her foster son, and her two nephews live near Madison and are involved in the child's life. She testified that the mother had stayed with her and her nephew at times when the mother's utilities had been turned off, that another of her nephews had kept the child and taken her to school, and that the father and the father's brother had kept the child at times. S.D.B., the paternal grandmother's cousin, testified that he had lived with the mother at her apartment for six months in 2011, along with his girlfriend at the time, A.P., who, he said, had been present at the apartment "every day, every night" although she had not "technically" lived there the entire six-month period. According to S.D.B., the mother had gone out at night while S.D.B. and A.P. had cared for the child until 2:00 or 3:00 a.m. each night. S.D.B. testified that the mother would sleep late and that he had made the child breakfast and changed her diapers while the mother slept until at least noon each day. He testified that the mother had allowed people she had just met to babysit the child, and, he said, he had felt like he *594 had to keep the child for the child's safety. He stated that he had not paid rent while living at the mother's apartment but that he had paid the electric bill, and that, after he had moved out of the mother's apartment, the electricity had been turned off for three months. S.D.B. stated that, when he had lived with the mother, she had not cooked or cared for the child and that she had not cleaned the apartment.
A.P. testified that, when she had lived with the mother for three or four months at the end of 2010 and the beginning of 2011, the mother had stayed mostly in her bed or had gone out at night, and that the mother had not taken care of the child. According to A.P., she or S.D.B. had cared for the child on a daily basis during that time, including feeding the child and changing her diapers. A.P. testified that she had continued to care for the child until 2013, although, she said, she had not been living with the mother, and that she had kept the child from Sunday to Friday each week for approximately two years. E.D.L., the father's cousin, testified that the mother had been to his house with the child from time to time to wash clothes and to spend the night, sometimes for weeks or months at a time up until August 2015, when he had been incarcerated for driving under the influence. He stated that he had allowed the visits to continue because he was "looking out" for the child and because the mother's house "was a wreck." He testified that the mother's house had had clothes, food, and ashtrays all over the bedroom; that the bathroom floor had been "coming up" and the toilet was backed up; and that the back doors of the house had not had locks on them.
The mother denied the testimony of S.D.B. and A.P. indicating that she had stayed out late at night or that she had left the child in S.D.B.'s or A.P.'s care. According to the mother, her most recent employment had ended two years before the trial because of her health conditions, which include asthma, allergies, and eczema, which, she testified, are all exacerbated by living in Alabama. The mother stated that her face, hands, and legs all break out, that she cannot breathe during pollen season, that her face and eyes become swollen, that her asthma flares up, and that she has to use a nebulizer or an inhaler or go to the emergency room in extreme instances. The mother testified that she also has dental issues that will require her to have surgery to replace all her teeth, that it will take anywhere from three months to a year for her to recover from that surgery, and that she would need support from her family in Virginia during that time. The mother testified that her conditions improve in Virginia and that she wanted to move there to be with her family.
A.C., the child's maternal grandfather, testified that he resides in Alexandria, Virginia, and that he speaks to the mother every day. He testified that he and the child's maternal grandmother are divorced but that they both live in Virginia and that he would pay for the mother and the child to live in Norfolk, Virginia, where the maternal grandmother resides. According to the maternal grandfather, he had purchased diapers and clothes and had given the mother money for the child since she was born until the time of the trial. He testified that he had begun supporting the mother and the child after the mother had quit working two years before the trial. He stated that, at the time of the trial, he was paying the mother's rent, that the mother was driving a vehicle that is registered in his name, and that he was paying for the insurance on that vehicle. The maternal grandfather stated that the mother's utilities had been cut off once because he had been out of the country and had forgotten to make that payment, but that it would *595 not happen again. He testified that he was committed to paying certain expenses for the mother and the child if they moved to Virginia and that he believed that that move was important because the mother would have more family support and fewer health problems. He testified also that he believed the mother would be able to get a job if she moved to Virginia. The maternal grandfather testified that, if the mother stayed in Alabama, he would continue to pay her expenses, but, he said, "she needs to find a job." He clarified that he would continue to support the mother until she could find a job.
The mother testified that she had primarily taken care of the child since the child was born and that the father had never provided for the child. She testified that, at the time of the trial, she and the child were living in a four-bedroom house and that she was driving a vehicle registered in her father's name. According to the mother, when the child gets home from school, they do homework together and then the child showers, they have dinner, and they watch a little television before going bed. She testified that the child gets more one on one time at her house than she does when she is with the father and that her household is more structured than his. The mother agreed that the child has difficulty in school with reading and grammar and that she has a speech impediment. She testified that there is someone in the classroom that the child's school had put in place to assist the child and that she had registered the child for reading classes during the summer of 2016. The mother stated that she had participated in the child's reading program and that, although the father had taken the child to the classes, he had not stayed to participate in the classes with the child. With regard to the child's gymnastic classes, the mother stated that the child had lost interest and that she was not going to force the child to participate.
The mother testified that it would be best for her and the child to relocate to Virginia because, she said, she would have family support and her health would improve. She stated that her mother, her brothers, her sister, her aunts and uncles, and her cousins all reside in Virginia and that they have a close relationship with the child. According to the mother, she had missed the deadline to enroll the child in Catholic school in Virginia, so, she said, the child would attend public school for the school year following the trial but would attend private school the next year. The mother admitted that the child has a lot of friends at the school she was attending at the time of the trial, which she had been attending for four years. The mother also testified that she would have better job opportunities in Virginia because her health would improve there. The mother testified that the father loves the child and that, although she and the father have difficulty communicating, they both love and care for the child. She testified that she would not move to Virginia if the child was not allowed to go with her.
The mother presented testimony from several friends indicating that she and the child have a close and loving relationship. Two of those friends indicated that they had not known of a period when the child had been living with someone else, such as A.P. Additionally, the mother's friends indicated that the condition of the mother's house was "fine for [their] standards" and that it was "decent" with regard to its cleanliness. They clarified that the house was appropriate, although not neat, in their opinions.
Analysis
The mother makes two arguments on appeal: that the juvenile court erred in awarding sole physical custody of the child *596 to the father and that the juvenile court lacked subject-matter jurisdiction to enter its judgment. We first address the mother's argument with regard to the juvenile court's subject-matter jurisdiction.
The mother argues on appeal that the father failed to make any allegations in his original petition that the child was dependent or that he was seeking a judicial determination of paternity such that the juvenile court acquired subject-matter jurisdiction over the father's action. She asserts that the father's original petition requested only a custody determination and that his amendment to his petition to include a request for a judicial determination of paternity did not cure the deficiencies in his original petition. "Lack of subject-matter jurisdiction can be raised at any time by the parties or by this court ex mero motu." J.L. v. Morgan Cty. Dep't of Human Res., 182 So.3d 570, 571 (Ala. Civ. App. 2015).
In his original petition, the father asserted, among other things, that he is the child's father and that he had completed a voluntary acknowledgment of paternity at the child's birth; he requested, among other relief, that the juvenile court "make a finding that the [father] is the legal and biological father of the minor child." The mother asserted in her motion to dismiss that the father had completed a voluntary acknowledgment of paternity at the child's birth and argued, among other things, that "[p]aternity of the minor child is not at issue and has never been at issue." There is no indication in the record on appeal, however, that the parties filed the acknowledgment of paternity with the Alabama Office of Vital Statistics. See § 26-17-304(b), Ala. Code 1975 ("An acknowledgment of paternity takes effect upon the signature of both the mother and putative father and the filing of the document with the Alabama Office of Vital Statistics."). Accordingly, the completion of the acknowledgment of paternity by the father without properly filing the acknowledgment did not legally establish the paternity of the child in this case. See § 26-17-304(b) and § 26-17-305, Ala. Code 1975. The AUPA provides for the juvenile court's jurisdiction in a case like this, in which the father has sought an award of child support pursuant to an action seeking a determination of parentage. See § 26-17-104, Ala. Code 1975; see also § 12-15-115, Ala. Code 1975.
At the trial, the parties stipulated that S.J.M. is the father of the child. In L.L.M. v. J.M.T., 964 So.2d 66, 73-74 (Ala. Civ. App. 2007), this court observed that a stipulation that there is no dispute as to paternity cannot divest the juvenile court of the subject-matter jurisdiction conferred on it by the legislature. Because we have already determined that the juvenile court in the present case had subject-matter jurisdiction to determine the father's paternity pursuant to his requests for custody and child support, the parties' stipulation as to the paternity of the child did not divest the juvenile court of jurisdiction to make those determinations. We conclude, therefore, that the juvenile court had subject-matter jurisdiction over the father's petition, as amended, insofar as it sought a determination of paternity, custody, and child support with regard to the child.
We next address the mother's argument on appeal that the juvenile court erred in awarding sole physical custody of the child to the father. First, the mother argues that the juvenile court erred in failing to apply the standard outlined in Ex parte McLendon, 455 So.2d 863 (Ala. 1984), with regard to a modification of custody. Citing Greene v. Greene, 249 Ala. 155, 30 So.2d 444 (1947), and T.N.S.R. v. N.P.W., 170 So.3d 684 (Ala. Civ. App. 2014), the mother argues that the McLendon standard is applicable *597 in the present case. In Greene, the parties were divorced by a judgment of the Jefferson Circuit Court and, pursuant to an agreement of the parties, the father was awarded sole physical custody of the only child of the marriage. 249 Ala. at 155, 30 So.2d at 444. The mother later filed a petition seeking a modification of custody, which the circuit court granted. Id. Our supreme court reversed the circuit court's judgment, observing, among other things, that
" '[w]here a parent has transferred to another the custody of his infant child by fair agreement, which has been acted upon by such other person to the manifest interest and welfare of the child, the parent will not be permitted to reclaim the custody of the child, unless he can show that a change of the custody will materially promote his child's welfare.' "
249 Ala. at 157, 30 So.2d at 445 (quoting Stringfellow v. Somerville, 95 Va. 701, 29 S.E. 685, 687 (1898) ).
This court observed in T.N.S.R. that the above-quoted statement in Greene"has since morphed into the [Ex parte ] McLendon [, 455 So.2d 863 (Ala. 1984),] standard." 170 So.3d at 687. In T.N.S.R., the child at issue was born out of wedlock. 170 So.3d at 685. The parties originally raised the child jointly until the child was approximately one year old, when the father moved to another state, leaving the child in the care of the mother and the child's paternal grandmother. Id. The father had continued to pay child support and to visit the child until the mother began a relationship with another man and the father lost communication with the mother and the child. Id. The father commenced a paternity and custody action, and, ultimately, the juvenile court in that case entered a judgment awarding the father sole physical custody of the child. Id. at 686. On appeal, this court observed that the juvenile court had not applied the rule of law outlined in Greene"because the parties tried the case under the theory that the juvenile court was making an initial custody determination based on the best interests of the child. See Ex parte Couch, 521 So.2d 987 (Ala. 1988)." Id. at 687. This court continued:
"However, even using the best-interests-of-the-child standard, the juvenile court was required to consider 'the effect on the child of disrupting or continuing an existing custodial status.' Ex parte Devine, 398 So.2d 686, 697 (Ala. 1981).
"In this case, the mother acted as the primary caretaker of the child for years, a weighty consideration. See Kaiser v. Kaiser, 868 So.2d 1095, 1101 (Ala. Civ. App. 2003) ('We agree that who the primary caregiver of a child has been is an important factor. Indeed, it may even be dispositive in an appropriate case.'). During that time, the child apparently received appropriate daily care from the mother, and the father failed to present any evidence rebutting the presumption of her fitness. See T.J. v. Calhoun Cnty. Dep't of Human Res., 116 So.3d 1168, 1175 (Ala. Civ. App. 2013) ('[T]he law presumes that a custodial parent is fit in every respect to care for his or her children.'). A trial court should tread lightly when considering severing 'ties of affection resulting from years of association between the child and its custodian,' Dale v. Dale, 54 Ala.App. 505, 507, 310 So.2d 225, 227 (Civ. App. 1975), and, ordinarily, a trial court should not disturb the 'stability in a child's environment and the child's relationships with those who have cared for and loved [him or her].' R.K. v. R.J., 843 So.2d 774, 777 n.2 (Ala. Civ. App. 2002).
"Furthermore, '[w]hen resolving a custody dispute, particularly in these days of blended families, a trial court should not perfunctorily separate half *598 siblings without giving sufficient consideration to the best interests of the children at issue.' A.B. v. J.B., 40 So.3d 723, 730 (Ala. Civ. App. 2009)."
170 So.3d at 687.
In accordance with T.N.S.R., we disagree with the mother's assertion on appeal that the juvenile court in the present case was required to apply the standard expressed in Ex parte McLendon with regard to the father's custody petition in the present case. Rather, like in T.N.S.R., the juvenile court in the present case was required to apply the best-interests standard discussed in Ex parte Couch, 521 So.2d 987 (Ala. 1988), while considering " 'the effect on the child of disrupting or continuing an existing custodial status.' " T.N.S.R., 170 So.3d at 687 (quoting Ex parte Devine, 398 So.2d 686, 697 (Ala. 1981) ).
The juvenile court did not specify which standard it applied in the present case. The mother argues on appeal that the juvenile court's judgment is due to be reversed even applying the best-interests-of-the-child standard.
"In determining whether an award of custody would be in the children's best interest, the court considers such factors as 'the children's age and sex and each parent's ability to provide for the children's educational, material, moral, and social needs. Tims v. Tims, 519 So.2d 558 (Ala. Civ. App. 1987). Likewise, it is proper for the court to consider the "characteristics of those seeking custody, including age, character, stability, mental and physical health ... [and] the interpersonal relationship between each child and each parent.' " Graham v. Graham, 640 So.2d 963, 964 (Ala. Civ. App. 1994) (quoting Ex parte Devine, 398 So.2d 686, 696-97 (Ala. 1981) ). The trial court's overriding consideration is the best interests and welfare of the children. Id. Because the trial court's award of custody based on ore tenus evidence is afforded a presumption of correctness on appeal, Scholl v. Parsons, [655 So.2d 1060 (Ala. Civ. App. 1995) ], this court is not permitted to reweigh the evidence on appeal or to substitute its judgment for that of the trial court. Somers v. McCoy, 777 So.2d 141 (Ala. Civ. App. 2000).
M.S.H. v. C.A.H., 829 So.2d 164, 168 (Ala. Civ. App. 2002).
The mother points to evidence presented at the trial, which, she says, indicates that she is a more stable parent than the father. There was evidence presented, however, indicating that the mother had left the child in the care of others; that she had neglected the child's care at times while she enjoyed late nights out and slept in on other days; that the mother's house was not kept clean; that the mother intended to move to Virginia with the child where the child would first transfer to public school and then to a different private school the next year; and that the mother had not been employed in the two years preceding the trial and relied financially on the maternal grandfather.
The father presented evidence indicating that the child is close to her half sisters and stepbrothers and the paternal grandmother; that the child had attended the same private school since she had entered school and was receiving special assistance in school for her difficulties with reading and spelling; that the father's stepson is the same age as the child and assists the child with her schoolwork; and that the child's schedule is structured in the father's home. Additionally, in its order denying the mother's postjudgment motion, the juvenile court noted the maternal grandfather's testimony indicating that the mother needed to find a job in concluding that the mother had not been unable to find a job in Alabama because of her health problems. Thus, the juvenile court *599 could have considered its assessment of the mother's credibility in viewing the remaining disputed evidence. The juvenile court could have determined from the evidence presented that the father could provide a more stable home for the child and that the effect on the child of disrupting the existing custodial status was mitigated by the fact that the child would remain in a school that she had attended consistently and where she had friends and assistance with her difficulties; that the child would remain close to her family members in Alabama; that the mother intended to disrupt the child's existing status by moving to Virginia and enrolling her in a public school for one year and then a private school the following year; and that the father was more able to provide for the child than the mother, who was financially reliant on the maternal grandfather. Considering our standard of review, we conclude that the evidence presented at the trial supports the juvenile court's judgment awarding sole physical custody of the child to the father and that that judgment is due to be affirmed.
AFFIRMED.
Thompson, P.J., and Pittman, Thomas, and Donaldson, JJ., concur.