Filed 6/24/24  Olin v. L.A. County Sheriff's Dept. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JEFFREY J. OLIN,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>LOS ANGELES COUNTY SHERIFF'S DEPARTMENT et al.,<br><br>    Defendants and Respondents. | B324159<br><br>(Los Angeles County Super. Ct. No. 22STCV08788)<br><br>ORDER MODIFYING OPINION (NO CHANGE IN JUDGMENT) AND DENYING APPELLANT'S PETITION FOR REHEARING |

       The opinion in the above-entitled matter filed on May 30, 2024 is modified as follows:

       1.    On pages 6–7, the entire sentence beginning with the words, "At the time, Jeffrey believed he was being detained" is replaced with the following sentence (including unrevised fn. 5):

At the time, Jeffrey believed he was being detained "as a suicide risk," but he later learned that he was being "held for threatening 'to kill a judge.' "**5**

---

**5** It is helpful at this point to describe some of the statutorily prescribed procedures for initiating a 5150 hold.  Namely, "[w]hen a peace officer takes a person into custody under section 5150 and presents that person to a facility designated by the county for evaluation and treatment, the officer must provide a written application describing the circumstances that brought the person's condition to the officer's attention and stating the officer 'has probable cause to believe that the person is, as a result of a mental health disorder, a danger to others, or to himself or herself, or gravely disabled.'  (§ 5150, subd. (e).)  In determining whether there is probable cause, a person authorized to make that determination may consider 'available relevant information about the historical course of the person's mental disorder' (§ 5150.05, subd. (a)) and 'shall not be limited to consideration of the danger of imminent harm' (§ 5150, subd. (b)).  [¶]  Before admitting a person into a designated facility, 'the professional person in charge of the facility or his or her designee shall assess the individual in person to determine the appropriateness of the involuntary detention.'  (§ 5151.)  'If, in the judgment of the professional person in charge of the facility designated by the county for evaluation and treatment [or other authorized individuals], the person cannot be properly served without being detained, the admitting facility shall require an application in writing stating the circumstances under which the person's condition was called to the [facility's] attention . . . and stating that [the facility] has probable cause [to detain the person].'  (§ 5150, subd. (e).)" (*Julian, supra*, 11 Cal.App.5th at pp. 375-376, capitalization & fn. omitted.) Notably, Jeffrey does not allege in a nonconclusory fashion that Wing or other individuals involved in initiating his section 5150 failed to comply with these procedures, except to claim that there was an insufficient basis for the requisite finding of probable cause.

2.	On page 11, the following two sentences are deleted: "The court later sustained demurrers and granted anti-SLAPP motions filed by all remaining defendants, including the County. The court entered corresponding judgments of dismissal."

3.	On page 11, the entire paragraph beginning with the words: "Jeffrey filed a timely notice of appeal" is deleted and replaced with the following paragraph:

Jeffrey filed a timely notice of appeal challenging the court's rulings on the R&M defendants' demurrer and anti-SLAPP motion and the LASD's demurrer. The instant appeal does not challenge rulings regarding any other defendants.

4.	On page 20, the following sentences are deleted:

Jeffrey added the County as a defendant in his first amended complaint, but Jeffrey failed to appeal the court's subsequent judgment of dismissal in the County's favor. His pursuit of the instant appeal thus can only be understood as an effort to hold LASD, rather than the County, liable for the actions of LASD deputies. But because LASD deputies are County employees, this is fundamentally incorrect.

5.	On page 20, footnote 8 is inserted at the end of the following sentence as shown below:

We acknowledge the potential for such liability, but not where, as here, the plaintiff has identified the incorrect defendant to hold liable under what must necessarily be a theory of vicarious liability, because the complaint lacks any nonconclusory allegations

3

supporting an LASD policy or practice giving rise to the alleged injury.[1]

6.  On page 21, footnote 9 is inserted at the end of the following sentence as shown below:

Nor does the first amended complaint contain any additional factual allegations that would address these issues.[2]

These modifications do not constitute a change in the judgment.

Appellant's petition for rehearing filed on June 14, 2024 is denied.

_____

ROTHSCHILD, P. J.          CHANEY, J.          WEINGART, J.

_____

[1] In noting that the County, rather than LASD, is the appropriate defendant, we do not intend to express any opinion on the merits of the claims against the County Jeffrey sets forth in the first amended complaint.

[2] The proposed addition of the County as a defendant in the first amended complaint does not breathe life into Jeffrey's claims *against LASD* or otherwise render the court's order dismissing his claims against LASD incorrect.

Filed 5/30/24  Olin v. L.A. County Sheriff's Dept. CA2/1 (unmodified opinion)
# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JEFFREY J. OLIN, | B324159 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 22STCV08788) |
| v. | |
| LOS ANGELES COUNTY SHERIFF'S DEPARTMENT et al., | |
| Defendants and Respondents. | |

APPEAL from judgments and orders of the Superior Court of Los Angeles County, Gail Killefer, Judge.  Affirmed.

Jeffrey J. Olin, in pro. per., for Plaintiff and Appellant.

Law Offices of Torres & Brenner and Anita Susan Brenner for Defendant and Respondent Los Angeles County Sheriff's Department.

Clyde & Co US, Douglas J. Collodel and Gretchen S. Carner for Defendants and Respondents Rombro & Manley, S. Roger Rombro and Melinda A. Manley.

Appellant Jeffrey J. Olin appeals from orders and judgments in his lawsuit against respondent Los Angeles County Sheriff's Department (LASD); LASD Detective David Wing; the Los Angeles County Superior Court and two judicial officers thereof; his former wife, Kelly Olin; and Rombro & Manley, LLP, Roger Rombro, and Melinda A. Manley (collectively, R&M defendants), the attorneys representing Kelly[3] in family law proceedings against Jeffrey.  Jeffrey's lawsuit asserts numerous causes of action, all relating to an alleged conspiracy among the defendants to alienate Jeffrey from his son.  Jeffrey argues the court reversibly erred when it (1) sustained, without leave to amend, the R&M defendants' demurrer, (2) granted the R&M defendants' special motion to strike the claims against them as a strategic lawsuit against public participation (SLAPP) under Code of Civil Procedure section 425.16 (the anti-SLAPP statute) and awarded them attorney fees under that statute, and (3) sustained, without leave to amend, LASD's demurrer.

The causes of action against the R&M defendants are based entirely on their assisting Kelly in preparing and filing a declaration in family law proceedings.  In that declaration, Kelly states Jeffrey was temporarily detained under Welfare and Institutions Code section 5150.[4]  Jeffrey's lawsuit alleged

---

[3] To avoid confusion, we refer to Jeffrey Olin and Kelly Olin by their first names.  No disrespect is thereby intended.

[4]  Unless otherwise indicated, subsequent statutory references are to the Welfare and Institutions Code.  Section 5150 "allows temporary detention of mentally disordered individuals who pose a danger either to themselves or to others, for

2

that this disclosure violated his constitutional right to privacy and the confidentiality requirements of section 5328. We hold the court correctly concluded the litigation privilege barred these claims and, on this basis, correctly granted the R&M defendants' anti-SLAPP motion and sustained their demurrer without leave to amend.

As to the causes of action against LASD, we conclude the complaint does not allege any LASD policy or practice, as it must to support Jeffrey's federal civil rights causes of action against LASD. We further conclude that the actions of the individual LASD personnel in the complaint cannot provide a basis for LASD to be held vicariously liable, because these individuals are employees of Los Angeles County (the County), not LASD.

Finally, we hold the court did not abuse its discretion in denying Jeffrey leave to amend his complaint to address these deficiencies. As to what additional allegations he would include, were he granted leave to amend, Jeffrey identifies only those reflected in the first amended complaint[5] he filed after the

---

treatment and evaluation." (*Jacobs v. Grossmont Hospital* (2003) 108 Cal.App.4th 69, 71–72.) We shall refer to such a detention as a "5150 hold," consistent with the parties' briefing and common vernacular. (See fns. 4 & 5, *post*, for additional detail regarding section 5150 holds.)

[5] This amended complaint still names LASD and the R&M defendants as defendants, despite the court's order sustaining their demurrers without leave to amend. The court apparently accepted the document as an amended complaint against the remaining defendants, the claims against whom had not yet been dismissed at the time Jeffrey filed the amended complaint, as well as against the County, which the first amended complaint adds as a defendant.

challenged rulings.  But nothing in the amended complaint addresses the deficiencies in his original claims against the R&M defendants and LASD.

Accordingly, we affirm.

## FACTS AND PROCEEDINGS BELOW

### A.  *Factual Allegations in the Complaint*

In an appeal from a judgment of dismissal following the sustaining of a demurrer, our review is de novo, and we must "determine whether the complaint states facts sufficient to constitute a cause of action."  (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)  Because a demurrer tests only the legal sufficiency of the pleading, we accept as true all properly pleaded material facts, and are "not concerned with the 'plaintiff's ability to prove . . . allegations, or the possible difficulty in making such proof.' "  (*Align Technology, Inc. v. Tran* (2009) 179 Cal.App.4th 949, 958, quoting *Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496.)  We disregard, however, allegations constituting contentions, deductions, or conclusions of fact or law.  (*Blank, supra*, at p. 318.)  "Facts appearing in exhibits attached to the first amended complaint also are accepted as true and are given precedence, to the extent they contradict the allegations."  (*Paul v. Patton* (2015) 235 Cal.App.4th 1088, 1091.)  The following factual summary is thus based on properly pleaded factual allegations in Jeffrey's complaint, as well as the documents it attaches and incorporates by reference:

Kelly and Jeffrey were divorced in 2011.  On July 21, 2018, Jeffrey "became aware that he was a victim of parental alienation caused by Kelly."  On August 3, 2018, Jeffrey sent Kelly a text message stating that he "inten[ded] to appear ex parte . . . to

4

ask the court to appoint a therapist to evaluate [their son] for parental alienation." Kelly "retaliated" by seeking a restraining order against Jeffrey in the pending family law proceedings between them. In November 2018, the family law court, through Commissioner Glenda Veasey (defendant below, but not a party to this appeal), granted Kelly's request for a domestic violence restraining order (DVRO) against Jeffrey for a period of five years. The restraining order was affirmed on appeal, and required, inter alia, that Jeffrey "surrender any firearms in his possession." Around this same time—in the "latter half of 2018"—Kelly and Veasey began a conspiracy to "destroy [Jeffrey's] relationship with his only child," which would later expand to include the other defendants Jeffrey named in his lawsuit.

In March 2019, Jeffrey filed a declaration in the family court proceedings, over which Veasey was still presiding, stating that he had been " 'caused to sink into the deepest depths of suicidal depression.' " In another filing with the court in April 2019, Jeffrey stated that he had been " 'rendered suicidal by the malicious actions of [his ex-wife] in combination with the injustices that have been meted out by Glenda Veasey,' " that he " 'hopes this ends soon, one way or the other,' " and that " '[t]he only reason [he] is still alive is that [he] got a list of four people who need to precede him.' " Veasey experienced these statements, taken in the context of Jeffrey's "open hostility against [her]" in other ways, to be "frightening and credible death threats."

On October 3, 2019, "Veasey and Kelly met, in private, outside the presence of the court reporter." (Capitalization omitted.) A minute order attached to the complaint reflects

5

that Veasey considered on this date "an ex parte application from [Kelly]" to amend the existing DVRO and granted the application. Veasey "modified the existing restraining order . . . to specify that [Jeffrey] shall not possess any swords, knives, daggers, fixed blade knives or other stabbing weapons and that all stabbing weapons must be turned over to law enforcement."

Kelly and Veasey then contacted LASD Detective David Wing (defendant below, but not a party to this appeal) and "he agreed to go [to] [Jeffrey's] home with the intent to '5150' [Jeffrey] [i.e., place him on a 5150 hold] at Veasey's request, because [Jeffrey] had expressed he was suicidal no less than [six] months before."[6] Wing and other LASD deputies went to Jeffrey's home "concerned with was whether [Jeffrey] was feeling suicidal" and did not immediately reference the amended DVRO, although Wing ultimately obtained a copy and provided it to Jeffrey at Jeffrey's request. Jeffrey allowed Wing and LASD deputies into his home to retrieve the weapons prohibited by the amended DVRO. LASD did not document the property they took in this process, and later denied having records of the property. Jeffrey was "put . . . in handcuffs" and "informed he was being [section] 5150'd. He was transported to College Hospital of Cerritos and placed on a 72-hour hold." At the time, Jeffrey believed he was being detained because he was suicidal, but he

---

[6] As noted, section 5150 "allows law enforcement officers . . . to bring an individual to an appropriate facility for assessment, evaluation, and treatment for up to 72 hours where there is ' "probable cause to believe that the person is, as a result of mental disorder, a danger to others, or to himself or herself, or gravely disabled." ' " (*Julian v. Mission Community Hospital* (2017) 11 Cal.App.5th 360, 375 (*Julian*).)

6

later learned that he was being "held for threatening 'to kill a judge.' "[7] On the recommendation of the psychologist

---

[7] It is helpful at this point to describe some of the statutorily prescribed procedures for initiating a 5150 hold. Namely, "[w]hen a peace officer takes a person into custody under section 5150 and presents that person to a facility designated by the county for evaluation and treatment, the officer must provide a written application describing the circumstances that brought the person's condition to the officer's attention and stating the officer 'has probable cause to believe that the person is, as a result of a mental health disorder, a danger to others, or to himself or herself, or gravely disabled.' (§ 5150, subd. (e).) In determining whether there is probable cause, a person authorized to make that determination may consider 'available relevant information about the historical course of the person's mental disorder' (§ 5150.05, subd. (a)) and 'shall not be limited to consideration of the danger of imminent harm' (§ 5150, subd. (b)). [¶] Before admitting a person into a designated facility, 'the professional person in charge of the facility or his or her designee shall assess the individual in person to determine the appropriateness of the involuntary detention.' (§ 5151.) 'If, in the judgment of the professional person in charge of the facility designated by the county for evaluation and treatment [or other authorized individuals], the person cannot be properly served without being detained, the admitting facility shall require an application in writing stating the circumstances under which the person's condition was called to the [facility's] attention . . . and stating that [the facility] has probable cause [to detain the person].' (§ 5150, subd. (e).)" (*Julian, supra*, 11 Cal.App.5th at pp. 375-376, capitalization & fn. omitted.) Notably, Jeffrey does not allege in a nonconclusory fashion that Wing or other individuals involved in initiating his section 5150 failed to comply with these procedures, except to claim that there was an insufficient basis for the requisite finding of probable cause.

7

who evaluated Jeffrey, Jeffrey was released early—after approximately 56 hours—from the 5150 hold.

In early 2021, Jeffrey filed a motion in the family law proceedings seeking a forensic psychologist evaluation of his son to assess the parental alienation that had been concerning him since 2018. To support her opposition to the motion, Kelly filed a declaration, which the R&M defendants assisted her in preparing and filing. In it, she declares that Jeffrey "was taken into [LASD] custody on or about the evening of October 4, 2019, under . . . section 5150, presumably due to his menacing and unstable behavior. At that time, [LASD personnel] contacted [her] advising [her] to 'get out of town for the weekend because they weren't sure how long he would be held.' As a safety precaution, [she was] escorted by [LASD deputies] both into and out of the courtroom, on multiple occasions." A copy of this declaration is attached to the complaint.

Also attached to the complaint is a copy of a declaration by Veasey.[8] The Veasey declaration states that "[o]n information and belief, on or about October 4, 2019, representatives went to [Jeffrey's] residence to take possession of [the] weapons [prohibited by the amended DVRO], and during such contact, [Jeffrey] was placed on a . . . section 5150 psychiatric hold." Neither Kelly's declaration nor Veasey's declaration contains any further details regarding Jeffrey's section 5150 hold, mental health, or mental health treatment.

The complaint describes the Kelly and Veasey declarations as reflecting that both Veasey and Kelly were "told about the

---

[8] Veasey filed this declaration in July 2021 in connection with subsequent efforts to obtain her own protective order against Jeffrey after he allegedly threatened her and her family.

[section] 5150 hold by LASD personnel" and as proof that "LASD personnel kept both of the women in the conspiracy [Kelly and Veasey] apprised of the status of [Jeffrey's] constitutionally and statutorily-confidential medical information throughout . . . [such that they] knew what was happening from beginning to end."

Later in 2021, Wing executed a search warrant to investigate claims by Veasey that Jeffrey had sent Veasey threatening emails. Jeffrey "posited that he had been hacked and that someone else sent some or all of the emails to Veasey." Wing, as opposed to another LASD detective, investigated these claims because a different detective would not "conceal[ ] [LASD] wrongdoing." Wing "demonstrably failed to follow the law with regard to that search warrant" by never providing Jeffrey with a copy. Jeffrey asked LASD for the records of his 5150 hold and was told that there was no record of it.[9]

As a result of the time Jeffrey spent in detention pursuant to the 5150 hold and the conspiracy against him, he suffers from posttraumatic stress disorder and major depressive disorder.

Based on these allegations, the complaint plead several causes of action: a false imprisonment claim against Kelly, Veasey, Wing, and LASD; a claim for intentional interference with parent-child relationship against all defendants except the R&M defendants, based on the custody and restraining order rulings of Veasey, which the complaint attributes to the broader conspiracy among all defendants; claims for "publication of private facts" (capitalization, boldface & underscoring omitted) and "intrusion into private matters" (capitalization, boldface

---

[9] The complaint also contains numerous allegations against the court and judicial officers that are not relevant to the instant appeal, and we therefore do not summarize them here.

& underscoring omitted) against all defendants based on disclosure by LASD (to Veasey and Kelly) and by Kelly and the R&M defendants (to the court in Kelly's declaration) of Jeffrey's "statutorily-confidential information"—namely, the fact that Jeffrey was placed on a 5150 hold; a claim against all defendants for denial of due process under the California and federal Constitutions; a claim under section 1983 of title 42 of the United States Code against all defendants for violation of Jeffrey's federal civil rights and a companion claim against LASD and the Los Angeles County Superior Court only under *Monell v. New York City Dept. of Social Services* (1978) 436 U.S. 658, 694; a derivative claim for interference with exercise of civil rights (Civ. Code, § 52.1) against all defendants; and a derivative intentional infliction of emotional distress claim against all defendants.

### B.    *Procedural History*

In response to the complaint, the R&M defendants filed a demurrer and special motion to strike under the anti-SLAPP statute.  The court concluded that all claims against the R&M defendants arose from petitioning activity protected under the anti-SLAPP statute, and that litigation privilege barred these claims.  On this and other bases, the court sustained the R&M defendants' demurrer without leave to amend and granted the R&M defendants' anti-SLAPP motion, including the motion's request for attorney fees and costs.

LASD also filed a demurrer, which the court sustained without leave to amend on the grounds that LASD is not a suable entity in a money damages lawsuit under California law, and that the complaint was vague and fatally flawed as to LASD. Following the orders sustaining the dismissal of claims against

10

LASD and the R&M defendants without leave to amend, the court entered corresponding judgments of dismissal in these defendants' favors.

On October 4, 2022, Jeffrey filed a first amended complaint as to the remaining defendants, adding the County as a defendant as well. The court later sustained demurrers and granted anti-SLAPP motions filed by all remaining defendants, including the County. The court entered corresponding judgments of dismissal.

Jeffrey filed a timely notice of appeal challenging the court's rulings on the R&M defendants' demurrer and anti-SLAPP motion and LASD's demurrer. He did not file an appeal challenging any of the court's rulings regarding any other defendants, including the order sustaining the County's demurrer and the resulting judgment of dismissal in the County's favor.

## DISCUSSION

### A. *Rulings Regarding the R&M Defendants*

The complaint alleges the R&M defendants participated in the conspiracy and committed the torts alleged solely by assisting Kelly in preparing and filing a declaration stating that Jeffrey had been placed on a 5150 hold. The complaint alleges no other conduct by the R&M defendants in furtherance of the conspiracy or as a basis for any of the other causes of action. Jeffrey argues that disclosing the fact of his 5150 hold in Kelly's declaration violated his constitutional right to privacy, as well as his statutory right under section 5328 to keep such information confidential. These violations form the basis for all causes of action against the R&M defendants in the complaint.

11

Section 5328 requires that "[a]ll information and records obtained in the course of providing services under[, inter alia] . . . Division 5 (commencing with Section 5000) . . . to either voluntary or involuntary recipients of services are confidential," subject to the exceptions enumerated in the section. (§ 5328, subd. (a).) Because section 5150 is within Division 5, "all information, records, and services provided pursuant to section 5150 involuntary psychiatric holds are confidential." (*In re M.L.* (2012) 210 Cal.App.4th 1457, 1469.) "Any person may bring an action against an individual who has willfully and knowingly released confidential information or records concerning him or her in violation of [section 5328]." (§ 5330, subd. (a).)

Jeffrey argues that the fact of his "having been subjected to a . . . 5150 hold" constitutes "confidential medical information" protected from disclosure under section 5328. We are aware of no case, and Jeffrey cites none, holding that the fact of an individual being detained under a section 5150 hold is "information" of the type section 5328 protects. We need not resolve this issue, however, because even accepting, for the purposes of Jeffrey's arguments on appeal, that section 5328 protects against disclosure of the fact that an individual was detained on a section 5150 hold, we agree with the trial court that the litigation privilege bars any cause of action based on the R&M defendants disclosing this information by filing Kelly's declaration.

### 1. *Demurrer ruling*

The litigation privilege, set forth in Civil Code section 47, subdivision (b), "applies to any publication required or permitted by law in the course of a judicial proceeding to achieve the objects

12

of the litigation, even [if] the publication is made outside the courtroom and no function of the court or its officers is involved." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212; accord, *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1057.)  "The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action."  (*Silberg, supra*, at p. 212.)  The purposes of the privilege include "afford[ing] litigants and witnesses free access to the courts without fear of being harassed subsequently by derivative tort actions, . . . encourag[ing] open channels of communication and zealous advocacy, . . . promot[ing] complete and truthful testimony" (*Rusheen, supra*, at p. 1063), and "promot[ing] effective judicial proceedings by encouraging ' "open channels of communication and the presentation of evidence" ' without the external threat of liability [citation], and 'by encouraging attorneys to zealously protect their clients' interests.' "  (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 322.)  "To further these purposes, the privilege has been broadly applied. It is absolute and applies regardless of malice."  (*Jacob B. v. County of Shasta* (2007) 40 Cal.4th 948, 955 (*Jacob B.*).)  The concerns underlying the privilege apply with particular force in the context of family law proceedings, because "when a court must make very difficult and critical decisions regarding child visitation, it should receive the maximum amount of relevant information.  Accordingly, '[c]ase law is clear that [Civil Code] section 47[, subd.] (b) absolutely protects litigants and other participants from being sued on the basis of communications

13

they make in the context of family law proceedings.' " (*Jacob B.*, *supra*, at p. 956.)

Here, the Kelly declaration, including its reference to the section 5150 hold, is "a communication to the court relevant to a family law decision [the court] must make"—namely, a decision regarding the relationship between Jeffrey and his son, something that Jeffrey's mental state necessarily factors into. (*Jacob B., supra,* 40 Cal.4th at p. 959.) "[S]uch a communication is privileged even if a specific communication might not be permitted by law because . . . it was . . . meant to be kept confidential. . . . [T]he privilege . . . extends to communications otherwise within its reach that might be deemed confidential." (*Ibid*.) Indeed, our state Supreme Court has concluded that the privilege applies "even to a constitutionally based privacy cause of action." (*Id.* at p. 961.) Because all causes of action against the R&M defendants in the complaint are based on a communication protected by the litigation privilege, the court correctly sustained the demurrer against these causes of action.

## 2. *Anti-SLAPP ruling*

The court did not err in granting the R&M defendants' anti-SLAPP motion for much the same reason it correctly sustained the R&M defendants' demurrer. The anti-SLAPP statute permits any cause of action against a person "arising from any act . . . in furtherance of the . . . right of petition or free speech" to be stricken unless the court finds a "probability" that the plaintiff will prevail on the claim involved. (Code Civ. Proc., § 425.16, subd. (b)(1).) When a defendant files an anti-SLAPP special motion to strike, the court proceeds with a two-step analysis. "At the first step of the analysis, the defendant must make two related showings. Comparing its statements and

14

conduct against the statute, it must demonstrate activity qualifying for protection.  (See [Code Civ. Proc.,] § 425.16, subd. (e).)  And comparing that protected activity against the complaint, it must also demonstrate that the activity supplies one or more elements of a plaintiff's claims.  ([Code Civ. Proc., § 425.16], subd. (b)(1).)"  (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 887.)  That is, that the claim "arise[s] from" the protected activity.  (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 620.)  If the defendant establishes this, the court proceeds to the second step, and considers whether the plaintiff has established a probability that he will prevail on the merits under a summary-judgment-like analysis.  (Code Civ. Proc., § 425.16, subd. (b)(1); see *Kyle v. Carmon* (1999) 71 Cal.App.4th 901, 907.)

Our review of an order granting an anti-SLAPP motion is de novo.  (*Geragos v. Abelyan* (2023) 88 Cal.App.5th 1005, 1020.)  We employ the same two-pronged analysis as the trial court in determining whether the anti-SLAPP motion was properly granted.  (*Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644, 1652.)

The R&M defendants met their burden below of establishing the claims against them arose from protected conduct " 'in furtherance of a person's right of petition' " under the anti-SLAPP statute.  (Code Civ. Proc., § 425.16, subd. (b)(1).)  The statute defines such conduct as including:  "any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law."  (Code Civ. Proc., § 425.16, subd. (e)(1).)  Indeed, "all communicative acts performed by attorneys as part of their representation of a client in a judicial proceeding or other

15

petitioning context are per se protected as petitioning activity by the anti-SLAPP statute." (*Cabral v. Martins* (2009) 177 Cal.App.4th 471, 480.) This protected activity provided an element of all Jeffrey's claims against the R&M defendants, because it is effectively the only conduct by the R&M defendants the complaint alleges. The claims against the R&M defendants thus arise from protected activity.

This shifted the burden to Jeffrey to make the substantial likelihood of success showing in the second step of the anti-SLAPP analysis. Jeffrey did not and could not make that showing because, for the reasons outlined above, the litigation privilege bars these claims. Accordingly, the court correctly granted the R&M defendants' anti-SLAPP motion.

Jeffrey argues that "case law explicitly says that . . . section 5150 holds are not the type of subject the SLAPP statute was intended to protect." But the authority he cites for this proposition addresses the implementation of a 5150 hold, not communication regarding the hold. (See *Swanson v. County of Riverside* (2019) 36 Cal.App.5th 361, 373.) Specifically, in that case, unlike here, the plaintiffs "[did] not seek recovery for the [defendant's] act of communicating information . . . [regarding] medical records. Instead, their allegations regard[ed] the [defendant's] alleged . . . decision to release [a plaintiff] before 72 hours [of his section 5150 hold] expired. There [was] nothing in the [defendant's] decision to release [plaintiff] before the 72-hour hold that implicate[d] the rights of free speech or petition. Therefore, it is not protected by the anti-SLAPP statute." (*Swanson, supra*, at p. 373.)

16

### B.     *Rulings Regarding the LASD Demurrer*

#### 1.     *Federal civil rights causes of action*

"The United States Supreme Court has held that cities, counties, and local officers sued in their official capacity are themselves 'persons' for purposes of [United States Code] section 1983 and, although they cannot be held vicariously liable under section 1983 for their subordinate officers' unlawful acts, they may be held directly liable for constitutional violations carried out under their own regulations, policies, customs, or usages by persons having 'final policymaking authority' over the actions at issue." (*Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820, 829 (*Venegas*), italics omitted; see *Julian, supra,* 11 Cal.App.5th at p. 384 [quoting this language from *Venegas*; cited by Jeffrey as supporting the viability of his federal claims against LASD].) Jeffrey's *Monell* claim likewise requires allegations to support a policy, custom or practice that was the " 'moving force' " behind the constitutional violation. (*Villegas v. Gilroy Garlic Festival Assn.* (9th Cir. 2008) 541 F.3d 950, 957 [claim requires " 'a direct causal link between a [county] policy or custom and the alleged constitutional deprivation' "].)

The parties disagree as to whether LASD is a "person" for the purposes of Jeffrey's claim under United States Code section 1983 or the *Monell* variation thereof. Even assuming, for the sake of argument, that LASD is a "person" in this sense, however, the complaint does not contain any nonconclusory allegations that could establish an LASD "polic[y] [or] custom[ ]" that violated Jeffrey's constitutional rights or caused his alleged injury, nor that any LASD agent with " 'final policymaking authority' " took actions having this effect. (*Venegas, supra*, 32 Cal.4th at p. 829.) To the contrary, the complaint alleges a

17

conspiracy aimed at a specific individual (Jeffrey), carried out through the actions of specific individuals at LASD—primarily Wing. Indeed, some allegations are inconsistent with Wing's actions being part of an LASD practice or policy—for example, that Wing handled the investigation of emails Veasey claimed Jeffrey sent to her, because a different detective would not "conceal[ ] [LASD] wrongdoing." Because the complaint lacks nonconclusory allegations of an LASD custom, practice, or policy, Jeffrey's federal civil rights causes of action fail as a matter of law—even under the very authority Jeffrey cites in arguing to the contrary. Namely, in *Julian, supra*, 11 Cal.App.5th 360, on which Jeffrey relies to support the viability of his federal claims, the court held that "[e]ven if the [defendants] [the Los Angeles Unified School District and the Los Angeles School District Police] were 'persons' for purposes of United States Code section 1983, [plaintiff] did not state a claim against them[, because] [g]overnment entities are liable under [United States Code] section 1983 only where their 'regulations, policies, customs, or usages by persons having "final policymaking authority" ' violate another's constitutional rights . . . [citations] . . . [and plaintiff] did not identify any such regulation, policy, or custom that allegedly violated [his] constitutional rights." (*Julian*, *supra*, at pp. 386–387.) In the other case on which Jeffrey primarily relies, *Streit v. County of Los Angeles* (9th Cir. 2001) 236 F.3d 552, the court held that LASD could be sued for federal civil rights violations resulting from actions "implementing [LASD] *policy* of conducting prisoner release records checks." (*Id.* at p. 555, italics added.) Whether or not LASD is acting as an agent of the state or the County in engaging in the acts alleged here—a key issue in *Streit* and similar cases,

18

and a point of contention in the parties' briefing—the complaint does not allege in a nonconclusory way that LASD was implementing any sort of broader LASD policy to alienate Jeffrey from his son, or that this conspiracy was the result of any LASD policy. Accordingly, Jeffrey's federal civil rights claims against LASD fail as a matter of law. (See *id.* at p. 559 ["[a] county is subject to [United States Code] section 1983 liability for such suits if its policies . . . caused the particular constitutional violation at issue"].)

### 2. *LASD is not the appropriate entity to sue based on the actions of Wing or other LASD personnel*

As noted above, the complaint does not allege an LASD policy, pursuant to which these individuals took the actions alleged, and the overarching theory of the complaint—a conspiracy to alienate Jeffrey from his son—is inconsistent with these alleged actions being part of a broader LASD policy. The complaint instead alleges actions of Wing and various other unnamed LASD personnel as the sole basis for all state law claims against LASD. But "the sheriff's department is a political subdivision of the county and not a separate legal entity (*Pierce v. San Mateo County Sheriff's Dept.* (2014) 232 Cal.App.4th 995, 1000, fn. 1 . . . ['The [s]heriff's [d]epartment is not a separate government entity, but [it] is a department' of the county]; *Trejo v. County of Los Angeles* (2020) 50 Cal.App.5th 129, 135 . . . [sheriff's department is a political "subunit" of the county]), and those employed by the sheriff's department, including sworn peace officers, are paid by the county (see *County of Kern v. Sparks* (2007) 149 Cal.App.4th 11, 16–17 . . . [county board of supervisors, not the sheriff, has authority to

19

set the compensation of employees in the sheriff's department]).'" (*People v. Tice* (2023) 89 Cal.App.5th 246, 254.) Accordingly, the *County* can be held vicariously liable for certain actions of LASD personnel, as they are County employees. (See *Rodriguez v. County of Los Angeles* (2013) 217 Cal.App.4th 806, 807; see also *Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992 [discussing scope of county's vicarious liability for county sheriff's deputies' conduct, describing them as county, not sheriff's department, employees].) Thus, Jeffrey should have sued the County, rather than LASD. Jeffrey added the County as a defendant in his first amended complaint, but Jeffrey failed to appeal the court's subsequent judgment of dismissal in the County's favor. His pursuit of the instant appeal thus can only be understood as an effort to hold LASD, rather than the County, liable for the actions of LASD deputies. But because LASD deputies are County employees, this is fundamentally incorrect.

In arguing to the contrary, Jeffrey cites authority for the proposition that "aggrieved individuals can enforce the . . . provisions [of which section 5328 is a part] through . . . common law and statutory causes of action, such as negligence, medical malpractice, false imprisonment, assault, battery, declaratory relief, United States Code section 1983 for constitutional violations, and Civil Code section 52.1." (See *Julian, supra*, 11 Cal.App.5th at p. 382.) Our holding regarding Jeffrey's claims against LASD does not suggest otherwise. We acknowledge the potential for such liability, but not where, as here, the plaintiff has identified the incorrect defendant to hold liable under what must necessarily be a theory of vicarious liability, because the complaint lacks any nonconclusory allegations supporting an LASD policy or practice giving rise to the alleged injury.

20

Because the complaint does not state a legally viable claim against LASD for these reasons, we may affirm the order sustaining the demurrer without addressing whether the basis set forth in the trial court's order would likewise support this outcome.  (See *Schermer v. Tatum* (2016) 245 Cal.App.4th 912, 923 [" 'If a demurrer is sustained, we exercise our independent judgment on whether a cause of action has been stated as a matter of law, regardless of reasons stated by the trial court.  [Citation.]  We affirm if the trial court's decision was correct on any theory.' "].)

## C.    *Leave to Amend*

" 'If it is reasonably possible [the complaint that is the subject of a sustained demurrer] can be cured by amendment, the trial court abuses its discretion by not granting leave to amend.  [Citation.]  The plaintiff has the burden of proving the possibility of cure by amendment.' " (*Nolte v. Cedars-Sinai Medical Center* (2015) 236 Cal.App.4th 1401, 1406.)  Jeffrey argues that "the first amended complaint, filed after the demurrers and anti-SLAPP motion from which this appeal resulted, shows that [he] could have amended his complaint" to state a legally viable claim for relief.  (Capitalization omitted.)  He specifically notes that the complaint added a claim under section 5330, the section providing for a private right of action based on the violation of, inter alia, section 5328.  This does not change the fatal flaws in Jeffrey's claims against LASD or the R&M defendants noted above.  Nor does the first amended complaint contain any additional factual allegations that would address these issues.  Accordingly, the court did not abuse its discretion in denying leave to amend.

21

# DISPOSITION

The judgments and orders are affirmed.  Respondents are awarded their costs on appeal.

<u>NOT TO BE PUBLISHED</u>.


ROTHSCHILD, P. J.

We concur:


CHANEY, J.


WEINGART, J.

22